305 Ga. 863
FINAL COPY

305 Ga. 863
FINAL COPY

S19A0409.  CARTER v. THE STATE.

WARREN, Justice.

Jehaziel Carter was convicted of malice murder, financial-transaction card fraud, and other crimes in connection with the shooting death of Eric Chepkuto.[1]  On appeal, Carter contends that

---

[1] The crimes were committed on the night of December 27, 2013.  On April 25, 2014, a Fulton County grand jury indicted Carter for malice murder, three counts of felony murder, armed robbery, aggravated assault, financial-transaction card fraud, identity fraud, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and possession of a firearm by a convicted felon during the commission of a felony.  Carter was tried before a jury from February 22 to 25, 2016.  The count of possession of a firearm by a convicted felon during the commission of a felony was nolle prossed and was not submitted to the jury.  The jury found Carter not guilty of felony murder predicated on armed robbery and the separate count of armed robbery, but guilty of the remaining counts.  On February 29, 2016, the trial court sentenced Carter to life imprisonment with the possibility of parole for malice murder, concurrent terms of ten years for financial-transaction card fraud and three years for identity fraud, and consecutive terms of five years for each of the verdicts on the firearms counts.  The guilty verdicts for felony murder were vacated by operation of law, and the aggravated-assault verdict was merged into the malice-murder conviction.  Carter filed a timely motion for new trial on February 29, 2016, which was later amended through new counsel on July 18, 2017.  In response to Carter's amended motion, the trial court on December 1, 2017, entered a modified sentence that reduced the financial-transaction card fraud sentence from ten years to three years, which is the statutory maximum sentence under OCGA §§ 16-9-33 (c), 16-9-38 (b). The amended motion was denied on October 16,

the evidence was insufficient to sustain his convictions, and in particular that the evidence was insufficient to support his conviction for financial-transaction card fraud. For the reasons described below in Division 3, we reverse Carter's conviction for financial-transaction card fraud. But because the evidence was legally sufficient to support the jury's guilty verdicts on the other counts, we affirm Carter's remaining convictions.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Carter's trial showed that Chepkuto lived with his wife, Katina Stoudemire, in a one-bedroom apartment in Fulton County. Stoudemire worked a night laundry shift at a nearby motel from 11:00 p.m. to 7:00 a.m. and usually left the apartment at 10:30 p.m. On December 27, 2013, Stoudemire went about this schedule as usual and left for work around 10:30 p.m. Shortly before then, however, Carter texted Chepkuto "Wussuup."[2]

2018, and Carter filed a timely notice of appeal on October 19, 2018. The appeal was docketed in this Court for the term beginning in December 2018 and submitted for a decision on the briefs.

[2] It is unclear exactly how Carter and Chepkuto were first acquainted

Chepkuto did not respond, but Carter texted again at 12:06 a.m.

The following texts were exchanged from 12:06 a.m. to 12:30 a.m.:

> CARTER: Wana see me tonight
> CARTER: Whatever u want
> CHEPKUTO: I want to f\*\*k
> CARTER: Ok…Can you host??
> CHEPKUTO: Yeah
> CARTER: What's you address I got the car I'll come now
> CHEPKUTO: I got scared by what you were carrying last time.
> CARTER: Lol oh na that's my bros I don't have it no more he sold it
> CHEPKUTO: Y[ou] sure?
> CARTER: My word
> CHEPKUTO: 8101 colquitt road. Text me when you get to the gate.
> CARTER: Omw [on my way]
> CARTER: I'm here
> CARTER: Which door??

At 12:41, 2:19, 2:23, and 2:48 a.m., calls were made from Chepkuto's cell phone to Bank of America, which was the bank associated with his debit card. Cell-tower data indicated that the 12:41 a.m. call was placed from a location close to Chepkuto's

---

with each other, but the record shows that they exchanged text messages on December 4, 5, and 7, 2013. It appears that Carter had posted on Craigslist seeking sexual activity, and that Chepkuto had sought to connect with other men for sex.

apartment, while the latter three were placed from a location near the residence where Carter was staying. Bank records and other evidence show that five attempts were made — at 3:11, 3:59, 4:00, 4:03, and 4:05 a.m. — to use the account number associated with Chepkuto's debit card to place one or more orders with Guitar Center. The order attempted at 3:11 a.m. was for the purchase of a microphone that cost $3,874.98; it used Carter's e-mail address, and specified that the microphone was to be delivered to the address of the mother of Carter's child.

Stoudemire returned home around 8:00 a.m. and found Chepkuto dead and lying naked on his side next to their bed, which she said had been turned the wrong way and had the sheets taken off. She quickly left the apartment and called 911. When police responded, Stoudemire was "very frantic." Investigators found no sign of forced entry, and a TV and laptop in the apartment had not been taken. Notably, however, neither Chepkuto's work phone nor personal cell phone was found. An opened box of three condoms was in the room; two were unopened, and the third wrapper was opened,

but the condom was not found.  Stoudemire testified that she and Chepkuto did not use condoms, that none were kept in their apartment, and that they were trying to conceive children.  A 9mm shell casing was found on the floor, and a bullet was found beside the bed in a location consistent with having ricocheted off the wall, where it left a mark.  Carter's fingerprints were not found anywhere in the room, but his DNA was a match for saliva found on Chepkuto's penis.

Chepkuto died of a gunshot to his face.  The placement of his body and blood-spatter patterns found on the wall indicated that he had been shot while seated at the edge of the bed.

A review of Chepkuto's cell phone and bank records led police to Carter, who was unemployed and living with his cousin at the time.  Carter slept on a couch in his cousin's living room, and his few possessions included a backpack, laptop, and cell phone.  When police arrested Carter and later searched his cousin's house, they found Chepkuto's work phone behind the couch where Carter slept.  Carter's backpack contained paperwork and other items belonging

to Carter, as well as ammunition and a gun — a Helwan 9mm — that was later determined to have fired the bullet that killed Chepkuto. Examination of Carter's cell phone revealed Internet searches about the functionality of a Helwan 9mm gun, including how to eject its magazine. Carter's cell phone also showed that he searched for Chepkuto's phone number around the same time that he first texted Chepkuto on December 27, 2013.

2. Carter contends that the evidence was insufficient to support his convictions. Specifically, he contends that the evidence presented at trial was only circumstantial and that it failed to exclude every reasonable hypothesis except his guilt. With the exception of Carter's conviction for financial-transaction card fraud, which we address separately in Division 3, we disagree that the evidence was insufficient to support Carter's convictions and therefore affirm them.

When evaluating a challenge to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have

found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979). Our review leaves to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be made from the evidence. See id.; *Menzies v. State*, 304 Ga. 156, 160 (816 SE2d 638) (2018). "'As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.'" *Williams v. State*, 287 Ga. 199, 200 (695 SE2d 246) (2010) (citation omitted).

According to Carter, the evidence presented at trial showed only that Carter and Chepkuto had a sexual encounter and that Chepkuto was found dead the next morning. He contends that the evidence did not show what happened in the intervening hours; that his fingerprints were not found in Chepkuto's apartment or on the gun; that nobody in the neighborhood saw or heard anything; and that the State did not present evidence that he had a motive to kill Chepkuto. But Carter's argument ignores the strong circumstantial

evidence of the crimes he committed, and "[t]he fact that the evidence of guilt was circumstantial does not render it insufficient." *Brown v. State*, 304 Ga. 435, 437 (819 SE2d 14) (2018).

Moreover, the fact of Carter's sexual encounter with Chepkuto is not the totality of the evidence against Carter. To that end, the text messages between Carter and Chepkuto and Carter's saliva on Chepkuto's penis showed that Carter was actually in Chepkuto's apartment around the time of Chepkuto's death. See *Winston v. State*, 303 Ga. 604, 607 (814 SE2d 408) (2018) (circumstantial evidence supporting murder conviction included evidence that the defendant was "the last person known to be with the victim at the time the killing took place"); *Phillips v. State*, 287 Ga. 560, 561 (697 SE2d 818) (2010) (circumstantial evidence supporting murder conviction included an admission that placed the defendant at the victim's "home within, at most, a very few hours of the death"). The evidence also revealed that calls were made from Chepkuto's personal cell phone on the night of his death — and showed the general locations from which those calls were made — in ways that

implicated Carter. Notably, 12 minutes after Carter texted Chepkuto about his arrival at Chepkuto's apartment, a call from Chepkuto's personal cell phone to the customer service number of Chepkuto's bank pinged off a cell tower near Chepkuto's apartment complex. Less than two hours later, three more calls from Chepkuto's cell phone to the same bank pinged off a tower near the residence where Carter was staying. See *Winston*, 303 Ga. at 607 (circumstantial evidence of murder included that "[t]he victim's cell phone continued to ping after his death in neighborhoods surrounding the crime scene and in Atlanta, where [the defendant] told police he went that afternoon"). Moreover, Chepkuto's debit card and billing information were used in attempts to order items online, but the email and shipping addresses used for at least one attempted order were connected to Carter. See *Benson v. State*, 294 Ga. 618, 619, 621 (754 SE2d 23) (2014) (circumstantial evidence supporting murder conviction included attempted use of the victim's credit card at the defendant's business); *Johnson v. State*, 288 Ga. 771, 774 (707 SE2d 92) (2011) (circumstantial evidence supporting

murder conviction included the defendant's use of the victim's debit card). The jury was authorized to infer that Carter used Chepkuto's personal cell phone and debit card in the hours after Chepkuto's death. Other incriminating evidence included that police found the murder weapon in a backpack containing Carter's belongings, and also found Chepkuto's work phone behind the couch where Carter slept. See *Phillips*, 287 Ga. at 561 (circumstantial evidence supporting murder conviction included the defendant's possession of the murder weapon); *Eckman v. State*, 274 Ga. 63, 65 (548 SE2d 310) (2001) (circumstantial evidence supporting murder conviction included the defendant's possession of property stolen from the victim). This evidence, though circumstantial, was very strong.

And although it is true that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused," OCGA § 24-14-6,[3]

---

[3] "The previous language of OCGA § 24-4-6 was carried into the new Evidence Code in identical form in the current version of OCGA § 24-14-6, and

we have made clear that "[n]ot every hypothesis is reasonable," so "only reasonable hypotheses" must be excluded. *Brown*, 304 Ga. at 437. In other words, the evidence "'need not exclude every *conceivable* inference or hypothesis — only those that are reasonable,'" *Gibson v. State*, 300 Ga. 494, 495 (796 SE2d 712) (2017) (citation omitted; emphasis in original), and "it is principally for the jury to determine whether an alternative hypothesis is reasonable." *Willis v. State*, 304 Ga. 781, 783 (822 SE2d 203) (2018).

Here, the evidence was legally sufficient to exclude every reasonable hypothesis other than Carter's guilt and to authorize a rational trier of fact to find beyond a reasonable doubt that Carter was guilty of the crimes of which he was convicted, other than the financial-transaction card fraud described below in Division 3. See *Jackson*, 443 U. S. at 319. See also *Gibson*, 300 Ga. at 495 ("[W]here

---

there is no materially identical federal rule of evidence." *Jackson v. State*, 305 Ga. 614, 620 (825 SE2d 188) (2019). And as explained in *State v. Almanza*, "[i]f there is no materially identical Federal Rule of Evidence and a provision of the old Evidence Code was retained in the new Code, our case law interpreting that former provision applies." 304 Ga. 553, 557 (820 SE2d 1) (2018).

the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law." (citation and punctuation omitted)).  We therefore affirm those convictions.

3.   Carter contends that the evidence was insufficient to support his conviction for financial-transaction card fraud under OCGA § 16-9-33 (a) (2) (D).  In particular, Carter says that the State failed to prove beyond a reasonable doubt that he used the account number associated with Chepkuto's debit card to obtain anything of value.  We agree.

To prove a violation of OCGA § 16-9-33 (a) (2) (D), the State had to prove that Carter,

> with intent to defraud [any person], . . . [o]btain[ed] money, goods, services, or anything else of value by . . . [g]iving, orally or in writing, a financial transaction card account number to the provider of the money, goods, services, or other thing of value for billing purposes without the authorization or permission of the cardholder or issuer for such use.

Although the State offered evidence that attempts were made to

place one or more orders with Guitar Center using the account number associated with Chepkuto's debit card, we find no evidence in the record that Carter obtained anything of value as a result of those attempts.  The evidence fails to prove an essential element of a violation of OCGA § 16-9-33 (a) (2) (D), and it is, therefore, insufficient to sustain his conviction for financial-transaction card fraud.  Accordingly, we reverse the conviction on Count 7.

Judgment affirmed in part and reversed in part.  All the Justices concur, except Bethel, J., who concurs in judgment only as to Division 3.

Decided May 20, 2019.

Murder. Fulton Superior Court. Before Judge Downs.

Brandon A. Bullard, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy

Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.