307 Ga. 233
FINAL COPY

S19A0789.  SHAW v. THE STATE.

BETHEL, Justice.

Earnest Shaw appeals from the denial of his motion for new trial after a jury found him guilty of malice murder and concealing the death of another in connection with the death of Elizabeth Richardson.[1] On appeal, Shaw argues that the evidence presented by the State was insufficient to support the jury's verdicts because the State's case was based entirely on circumstantial evidence and the State did not exclude all reasonable theories of the crimes other than Shaw's guilt. Shaw also argues that the trial court erred by

[1] The crimes occurred on September 1, 2007. On February 4, 2008, Shaw was indicted by a Montgomery County grand jury for malice murder and concealing the death of another. At a jury trial held from December 7 to 10, 2009, Shaw was found guilty on both counts. Shaw was sentenced to serve a term of life imprisonment for malice murder and a concurrent term of imprisonment of ten years for concealing the death of another. Shaw filed a motion for new trial on December 16, 2009. He subsequently amended his motion through new counsel on May 15, 2018. A hearing on his amended motion was held on June 29, 2018, and the trial court denied his motion on December 3, 2018. Shaw filed a notice of appeal on December 17, 2018. This case was docketed to the Court's April 2019 term and submitted for a decision on the briefs.

requiring Shaw to proceed pro se during a pre-trial hearing on the admission of certain evidence and by admitting certain evidence at trial. He further contends that he received ineffective assistance from his trial counsel. Finding no grounds for reversal, we affirm.

1. *Sufficiency of the Evidence.*

(a) Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Leanne Shaw, Shaw's daughter, lived with Shaw in 2007. During that time, Shaw and Elizabeth were dating. Elizabeth lived up the street from Shaw in her mother's house.

While Leanne was living with Shaw, she witnessed a number of arguments between Shaw and Elizabeth and saw Shaw strike Elizabeth on two occasions. On the morning of September 1, 2007, Leanne witnessed a "loud" argument between Shaw and Elizabeth in the house. Shaw and Elizabeth went out into the yard and continued arguing. At one point, Leanne witnessed Shaw grab Elizabeth by the hair, push her to the ground, and slap her. Shaw then picked up a crowbar and, while Elizabeth was lying on the

ground on her back, threw the crowbar to the ground beside her. Shaw then said, "Next time I won't miss." Leanne testified that, shortly after that, sometime between 11:00 a.m. and noon, Shaw and Elizabeth left Shaw's house in Shaw's silver Chevrolet truck. Shaw returned to the house without Elizabeth about 15 to 20 minutes later. Leanne never saw or heard from Elizabeth again.

After Shaw returned to the house, he went back to his bedroom, changed clothes, took the sheets off his bed, asked Leanne to make the bed, and left the house. Leanne testified that Shaw put the bed sheets in his truck and drove away. Leanne did not see Shaw again until the next day. Leanne also testified that Shaw had a habit of keeping his vehicles clean. She testified that a man named "Blind" came to Shaw's house every weekend to wash both of Shaw's trucks. According to Leanne, Shaw did not normally clean the trucks himself.

The State also presented the testimony of Brandon Shaw, Shaw's son. Brandon was also at Shaw's house on the morning of September 1. He heard Shaw and Elizabeth arguing and left the

3

house. Brandon never saw or heard from Elizabeth again. The next day, Shaw called Brandon because he had run out of gas. Brandon brought gas over to Shaw and noticed bed sheets in Shaw's Chevrolet truck, which he found unusual. Brandon also testified that Shaw was very "picky" about his trucks and that only a man named Isaiah "Blind" Miles cleaned them. However, the day after Brandon brought gas to Shaw to fill up his truck, Brandon saw Shaw cleaning his truck.

Duel Davis testified that, on September 6, he was hunting in a heavily wooded area in Montgomery County less than 10 miles from Shaw's house when he found a dead body, which was later identified as Elizabeth. After finding the body, Davis called 911.

Special Agent Todd Crosby, a crime-scene specialist from the Georgia Bureau of Investigation, arrived later that afternoon and began processing the area around Elizabeth's body, which was naked. In that area, Crosby found purge fluid that had leaked from Elizabeth's body as it began to decompose. Based on the body's state of decomposition, Crosby determined that the body had been at the

4

location in the woods for several days when it was discovered. Crosby also observed holes on both sides of Elizabeth's skull, which he attributed to Elizabeth having been struck on both sides of her head.

Crosby testified that, on September 11, after Elizabeth's body was removed from the crime scene, he performed luminol testing at the scene and detected trace amounts of blood and bodily fluids there and in the area leading back up to a nearby dirt road. Crosby performed additional luminol testing at Shaw's house. There, several areas in the backyard and the interior cabs of two trucks owned by Shaw yielded a positive reaction for the presence of blood.

GBI Special Agent Catherine Sapp also participated in the crime-scene investigation by assisting Crosby in searching for blood in Shaw's backyard. She detected a blood stain on a pair of shoes, and the chemical test she performed indicated that it was human blood. She then performed luminol testing on three vehicles, each of which reacted positively for the presence of blood. She and Crosby also detected the presence of blood in a dirt sample and on a rug,

both of which were found in Shaw's backyard.

The medical examiner, Dr. Mark Koponen, testified that Elizabeth's body was received for autopsy on September 7 "extensively decomposed," "partially skeletonized," and "partially mummified." Dr. Koponen noted two "large" holes in her skull, photographs of which were admitted and shown to the jury. One hole was "slightly larger" than the other, but both holes were oval in shape with fractures radiating from each wound. Based on the nature of the wounds, Dr. Koponen ruled out a gunshot as the source of the injuries. Dr. Koponen testified that the trauma likely caused portions of the skull to be driven into Elizabeth's brain, causing "tremendous brain damage and bleeding," which resulted in her death. Dr. Koponen testified that Elizabeth died either instantly or "very, very shortly after receiving her injury." He also stated that the condition of her body at the time of the autopsy was consistent with her having been dead "most, if not all" of the time between September 1 and September 6, when her body was discovered. He stated that the level of decomposition was not consistent with

6

Elizabeth's body being exposed to the elements for only one or two days.

The jury also heard testimony from Dr. Frederick Snow, a forensic anthropologist who assisted Dr. Koponen. Dr. Snow's examination established that the two wounds to Elizabeth's skull were the result of non-specific blunt force trauma and appeared to be caused by a "circular implement" of some kind. Dr. Snow testified that, at the time Elizabeth's remains were brought into the lab for autopsy on September 7, she had been dead "probably a week, somewhere along in there. Certainly not just a day or two."

The State also called GBI Special Agent Lindsey Giddens to testify. Giddens assisted in the investigation of Elizabeth's death and executed a search warrant at Shaw's house. During that search, Giddens found a burn pile behind the house containing a burned piece of a flip-flop sandal, two metal rings, a burned piece of a blue towel, and a burned metal shaft of a hammer, all of which were seized by GBI. Giddens also testified that, during her search of Shaw's residence, she entered Shaw's workshop and saw that Shaw

had gas cans, hammers, and numerous tools.

The State also called GBI Special Agent Kendra Lynn, who testified that, on the afternoon of September 6, she responded to the area where Elizabeth's body was discovered. Elizabeth's body was not visible from the road, but was found in a wooded area off a dirt road in a rural part of Montgomery County.

Lynn testified that the body at the scene was not identified as Elizabeth until the following afternoon, September 7. Later that day, Lynn briefly spoke with Elizabeth's mother, Barbara Blaxton. Lynn and two deputies from the Toombs County Sheriff's Office then met with and interviewed Shaw at his residence. Lynn testified that Shaw was not under arrest during that interview.

In the interview, Lynn and Shaw discussed Shaw's relationship with Elizabeth. Shaw told Lynn that Elizabeth was his girlfriend, that they had a sexual relationship, and that she regularly stayed at his house. Shaw indicated that he and Elizabeth "had a few rough spots" that were alcohol-related but that they always worked them out. In that conversation, Shaw told Lynn that

he smoked Marlboro 100 cigarettes.

Shaw also told Lynn that, around 9:30 a.m. on September 1, Elizabeth called him and asked him to pick her up from her mother's house. Shaw stated that he then picked Elizabeth up on the side of the road as she walked toward his house. Elizabeth was wearing sandals at the time. Shaw told Lynn that he and Elizabeth went back to his house and had sex, then he took her back home. He also told Lynn that Elizabeth sometimes tried to sneak out of her house to see him because her mother did not like Shaw. Shaw said this had happened recently and that he suffered cuts to his arms when Elizabeth broke her bedroom window while trying to sneak out of the house to see Shaw while her former boyfriend, Eric Peavy, was visiting.

Lynn testified that she and the deputies spoke with Shaw for about 20 minutes before he asked why they were there. When Lynn informed Shaw that Elizabeth's body had been found and that they were investigating her death, Shaw "became upset very briefly" but then continued talking. He never asked what happened to Elizabeth

9

or where her body had been located. He then told Lynn that he had seen Elizabeth the afternoon of September 1 with Anthony Bledsoe. Later in the interview, Shaw told Lynn about a man named Geron Collins and mentioned that Collins gave rides to Elizabeth and that she sometimes cleaned his house. Shaw then mentioned Jamie Richardson, noting that Elizabeth referred to him as her "husband," which had caused tension with Shaw in the past. Shaw also recounted a recent incident in which he and Elizabeth had been parked in a lane near the home of Deavis Williamson, one of their neighbors. Shaw told Lynn that he and Elizabeth had been in the woods when Elizabeth got upset, jumped out of Shaw's truck, ripped her clothes off, and ran up to Williamson's house. Shaw told Lynn that he and Elizabeth had argued before, but that he had never struck her or hurt her.

Lynn testified that, the next day, September 8, she returned to the area where Elizabeth's body had been discovered and found and seized an empty pack of Marlboro 100 cigarettes. As she left the scene and drove down the adjacent dirt road, she noticed a sock and

10

a piece of blue shop towel in the road. She photographed and collected those items. She testified that she then recalled having seen a piece of blue towel near Elizabeth's body during a prior visit to the scene, so she returned to that area, located the piece of towel she had seen, and collected it as evidence. Lynn testified that, by September 8, her investigation began to center on Shaw based on interviews with several witnesses, the fact that she had discovered an empty pack of cigarettes near Elizabeth's body that were the same brand Shaw smoked, and that Shaw was the last person to be seen with Elizabeth before she disappeared.

On September 11, Lynn again interviewed Shaw, this time at the Toombs County Sheriff's Office. Shaw was not under arrest at the time. In that interview, Shaw told Lynn that Elizabeth was on probation and gave her the names of several of Elizabeth's acquaintances. He also told Lynn that he and Elizabeth liked to meet at various places to have sex, including in a wooded area near Williamson's house. Shaw stated that Elizabeth last stayed at his house a week before she disappeared, that she had gone back to her

11

mother's house that day, and that he had cut his arm on a window of Elizabeth's mother's house as Elizabeth was trying to sneak out. Shaw said that Elizabeth called him the morning of September 1, that he had picked her up around 8:30 or 9:00 a.m., and that they were in the bedroom together when his daughter, Leanne, knocked on the door and asked for the keys to his truck so that she could take her boyfriend to work. Shaw said that he took Elizabeth home after Leanne returned to the house. He also told Lynn about prior incidents with Doris Kolb, his former romantic partner, in which he broke into Kolb's house and set her belongings on fire.

While Lynn was interviewing Shaw, Leanne Shaw was being interviewed in a separate room. Lynn took a break from interviewing Shaw and learned that Leanne had provided information to the investigators about the events she witnessed at Shaw's house the morning of September 1. Lynn then resumed her interview with Shaw, but this time gave him *Miranda* warnings.[2]

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Shaw indicated that he understood his rights, and the interview continued.

Lynn told Shaw that she was aware of an altercation between Shaw and Elizabeth on September 1. Shaw then told Lynn that Elizabeth was upset with him because he had filed a report about harassing phone calls that her brothers had made to Shaw. Shaw said that he and Elizabeth then started pushing each other, that she fell, and that he then grabbed her hair. Shaw told Lynn that he never hit Elizabeth, that he did not have any kind of tool in his hand while they argued, and that Elizabeth was "okay" when he left. Shaw told Lynn that he then took Elizabeth to a man's house in Vidalia. Lynn later interviewed William Segar, the man who owned the house where Shaw claimed to have dropped off Elizabeth the afternoon of September 1. Segar said Shaw's statement was untrue and that he had not seen Elizabeth in some time.

During another break from interviewing Shaw, Lynn learned that Leanne had told investigators that Shaw had taken the sheets off his bed when he returned to the house. Lynn resumed the

interview and again provided *Miranda* warnings to Shaw. When asked about the sheets, Shaw denied removing them from his house several times before admitting that he took the sheets off the bed and threw them in a dumpster. Shaw told Lynn that he removed the sheets because of his "criminal history" and because he worried that, if Elizabeth called the police because of their argument, his business license could be taken away. After this interview, Shaw was placed under arrest at the Toombs County jail.

Lynn testified that Shaw's bed sheets were never found. She also testified that she never identified other suspects in the case. She stated that the case centered on Shaw based on the interviews he provided, evidence that emerged about him being the last person seen with Elizabeth, and evidence that he and Elizabeth had an abusive relationship, including Leanne's statement about the altercation on September 1. Lynn stated that she had not learned any information about any other person that would indicate someone besides Shaw had engaged in "any other violence toward" Elizabeth. Although Shaw had told her about Elizabeth's drug use

14

and "a black man in a white car" that Elizabeth associated with, Lynn stated that there was no one, including Shaw, who indicated to her that there was any other person Elizabeth was scared of or who had ever hurt her.[3] Lynn said that even though Shaw had identified Geron Collins by name and given nicknames of other people Elizabeth associated with, "there was no other information as to the fact that they would be even remotely involved in her death." Lynn indicated that Collins was interviewed by the sheriff and that if there had been viable suspects besides Shaw she would have pursued them.

Lynn was also asked on cross-examination about a statement made by Isaiah "Blind" Miles, the man who regularly washed Shaw's trucks. In December 2007, Miles told investigators that he had seen

---

[3] Another individual, Tina Coleman, also told Lynn that Elizabeth associated with an older black male who gave her drugs and who drove an old, white Buick. Lynn did not interview the man, later identified as Geron Collins, but he was interviewed by the sheriff. Lynn testified that she spoke with Eric Peavy and Tammy Ward about Collins, but neither witness gave any indication that Elizabeth had been threatened by Collins or that she was afraid of him. In his interview with Collins, the sheriff confirmed that Collins and Elizabeth had a sexual relationship and that Collins helped Elizabeth pay her probation fees.

Elizabeth with a white male on September 4. Lynn testified that she did not follow up on the lead because she believed Miles had his dates confused, in light of the forensic evidence that Elizabeth had already been dead for several days by September 4. Lynn was also aware that Miles had vision problems.

The State also presented testimony from a number of witnesses regarding the relationship between Shaw and Elizabeth, including Elizabeth's friend, Tammy Ward. Ward stated that she had witnessed arguments between Shaw and Elizabeth and had once seen Shaw "dragging" Elizabeth "across the yard by her hair." Ward testified that Elizabeth had asked her not to call the police after this incident because "[Shaw] would get back at her." Elizabeth also told Ward that Shaw was mean to her and that, at times, when Shaw had been drinking, "he would get so mean . . . he'd go to hit [his son] and [Elizabeth would] stand in front of him and he would hit her." Ward testified that Elizabeth was frightened of Shaw and "would run from [Shaw] and hide from him," but that Shaw "would follow

[Elizabeth]" and "find her, wherever she went."[4] Ward also testified that Elizabeth's pocketbook had "funny shaped" rings, which were oval-shaped, but not circular.

The State also called Barbara Blaxton, Elizabeth's mother, to testify. Blaxton testified that Shaw had "threatened to kill [both her and Elizabeth]." Blaxton testified that, in the past, she had witnessed Shaw strike Elizabeth, that she had seen bruises on Elizabeth, and that she had called the police to report Shaw's conduct numerous times. Two days before Blaxton last saw Elizabeth, Shaw came to Blaxton's house and broke one of her windows.[5]

---

[4] When asked why Elizabeth continued to go to Shaw's house despite his behavior toward her, Ward replied, "I think it was due to the alcohol and the drugs. . . . That's my opinion." Ward also testified that she and others, including Shaw, had given prescription Xanax to Elizabeth and that Elizabeth had a drug problem that began after her daughter was killed in a car accident. Ward also testified that Shaw gave Elizabeth alcohol and money that she used to buy drugs. Ward also testified that she was aware that Elizabeth "kept" three "male companions," one of whom would regularly come by to take Elizabeth to her probation office and would pay her probation fees for her.

[5] Blaxton also testified that Elizabeth had a problem with alcohol and drugs that began after the death of Elizabeth's daughter. Blaxton confirmed that Collins had purchased a car for Elizabeth and that he paid her probation fees. Blaxton testified that she had previously called the police on one of her

The State also presented testimony from Jamie Richardson, Elizabeth's husband. The couple separated after the death of their daughter in 2003, but they never divorced.[6] Jamie was aware that Elizabeth was in a relationship with Shaw after the couple separated. On one occasion, Elizabeth came to stay at Jamie's house. Shaw picked her up that evening, and the next morning, Shaw called Jamie. In that call, which took place sometime in 2004 or 2005, Shaw asked for advice about his relationship with Elizabeth, specifically "how to control her" because she "wouldn't do what he wanted her to do." Shaw then told Jamie that he was going to kill Elizabeth.

The State also presented testimony from Steven Anthony Bledsoe, a friend of Elizabeth's who lived near both Shaw and Elizabeth. Bledsoe testified that one time he was passing by Shaw's

---

neighbors, William Coleman, because Coleman had threatened to burn down her house and had stalked and threatened to hurt Elizabeth. Blaxton further testified that Elizabeth previously told her that she had been raped by a man named Dwayne Heckle but that Elizabeth did not press charges against him.

[6] Jamie testified that Elizabeth "struggled" and was "not the same person" after their daughter died.

house and saw that Shaw and Elizabeth were in a "struggle" in the front yard in which Shaw "had a firm grasp on her" and the two were "yelling back and forth." On another occasion, Bledsoe saw Elizabeth in the field behind his house, and Elizabeth told him that she was running from Shaw. Bledsoe testified that he had "occasionally" seen bruises on Elizabeth, although he was not sure how she got them.

The State also presented testimony from Eric Peavy, who testified that he had been friends with Elizabeth since 1999. Peavy testified that, in the summer of 2007, he drove from his home in Savannah to Elizabeth's home in Vidalia to visit her. While he was visiting, Shaw came to the house, argued with Elizabeth on the front porch, and then broke Elizabeth's bedroom window. Peavy also testified that Elizabeth had told him that Shaw was abusive toward her and that she was afraid of Shaw.

The State also presented testimony from Toombs County Sheriff's Deputy Robert Wiggs, who testified that he had answered emergency calls from Elizabeth regarding prior incidents involving Shaw. In one of the calls, he and another deputy responded to a

19

report of an argument or fight. When they arrived, Elizabeth was sitting on the front steps of her mother's house. She told the deputies that Shaw had taken her clothes, forced her out of his house, and made her walk home unclothed. Shaw later told the deputies that he "removed" Elizabeth from his house because he did not want her to smoke in the house. On another occasion, Wiggs and another officer responded to a call from Elizabeth regarding an altercation between her and Shaw. Wiggs stated that Elizabeth did not want to press any charges against Shaw at that time, but when they spoke to her, the other officer noticed that Elizabeth had bruises on her body.

The State also called Toombs County Sheriff's Deputy Marty Craven to testify. Craven testified about responding to a call after an incident in which Shaw had tried to get into Elizabeth's mother's house through a window. Craven also responded to a later call regarding an incident in which Elizabeth reported that Shaw had chased her around Shaw's yard with a hammer. Craven testified that it was a common occurrence to receive calls about incidents like

this involving Shaw.

The State presented testimony from Deavis Williamson, who lived on the same road as both Shaw and Elizabeth. Williamson testified that, in 2007, Elizabeth came to her house "frazzled" and asked to use her phone. She had no clothing on and had wrapped a sheet around her body. Elizabeth claimed that she had been raped in the woods and that she wanted to call her mother. While Elizabeth was at Williamson's house, Shaw drove by, and Elizabeth pointed him out to Williamson.

The State also presented testimony from Doris Kolb regarding several incidents of domestic violence that occurred during her relationship with Shaw.[7] Kolb and Shaw were former romantic partners, and they have a son together. Kolb testified that, in 1998, shortly after she moved in with Shaw, they got in an argument, and she left the residence for the night. When she returned to the

---

[7] Following a pre-trial hearing, this testimony was admitted as evidence of similar transactions that could be considered by the jury in regard to Shaw's course of conduct and bent of mind. During Kolb's testimony, the trial court gave a limiting instruction to the jury regarding the use of this testimony.

residence the next day, she found that Shaw had burned all of Kolb's and her son's possessions, including clothes, toys, and furniture. Shaw admitted to doing so. Kolb also testified that after she and her son had moved out of Shaw's home, Shaw picked up Kolb and her son in his vehicle while they were walking home. Kolb and Shaw began arguing, after which Shaw struck Kolb and placed his hands around her neck. Later that night, Shaw went to Kolb's house "extremely drunk" and broke down the metal door to her house, which had been equipped with a deadbolt and chain lock. Kolb's son left the house through the back door, ran to a neighbor's house, and called 911. Kolb and Shaw were "in the midst of fighting" when law enforcement arrived.

The State also called Merle Richardson, Elizabeth's father-in-law, to testify. Merle was also Shaw's neighbor. He testified that one night, during the time Shaw was in a relationship with Kolb, he heard a "ruckus" coming from Shaw's yard and saw flames. Shaw had pulled a couch from his house into the front yard and set it on fire. Shaw was making gestures and "hollering and screaming" at

Kolb and two children and brought several items out of the house and threw them into the fire.

(b) Shaw contends that the evidence presented by the State was insufficient because the State's case was based entirely on circumstantial evidence and the State failed to disprove two alternative theories of Elizabeth's death put forward by Shaw. Those theories posited that Elizabeth's involvement in a "drug culture" led to her death and that Shaw could not have committed the crimes when and how the State alleged because Isaiah Miles saw Elizabeth alive after the date on which the State alleged she was killed.

Because Shaw was tried before January 1, 2013, the provisions of the prior Evidence Code were in effect. Former OCGA § 24-4-6 provided that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."[8] Under that provision, questions

---

[8] Although Shaw was tried before the current Evidence Code went into effect, we reiterate that former OCGA § 24-4-6 was carried forward in identical

23

regarding the reasonableness of hypotheses are generally to be decided by the jury that heard the evidence. *Willis v. State*, 304 Ga. 122, 125 (1) (816 SE2d 656) (2018).

> Where the jury is authorized to find the evidence sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law. When reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the verdict. Moreover, in considering circumstantial evidence, jurors are entitled to draw reasonable inferences from the evidence based on their own common-sense understanding of the world. As a general rule, jurors are authorized to make such reasonable inferences and reasonable deductions as ordinarily prudent persons would make in light of their everyday experience and knowledge of human conduct and behavior.

(Citations and punctuation omitted.) *McKie v. State*, 306 Ga. 111, 115 (829 SE2d 376) (2019).

From the evidence presented at trial, the jury was entitled to reject the alternative theories of Elizabeth's death that Shaw has

form into the current Evidence Code and is currently codified as OCGA § 24-14-6. See *Carter v. State*, 305 Ga. 863, 868 (2) n.3 (828 SE2d 317) (2019). Because there is no materially identical federal rule, the former provision has the same meaning as the current provision. Id. Accordingly, cases interpreting the current provision are also relevant for cases like this one applying the former provision.

put forward. The evidence established that Elizabeth began abusing alcohol and drugs after the death of her daughter and that she had connections to three other men in the community who Shaw's counsel argued should have been investigated for her death due to their connection with a "drug culture." Additionally, Miles told Lynn that he saw Elizabeth three days after the date on which the State asserted she had been killed by Shaw. However, even though there was evidence presented at trial as to these issues, including lengthy questioning of Lynn by Shaw's counsel about these leads, such evidence went to the weight and credibility of the State's witnesses, specifically Lynn. Questions as to weight and credibility are for the jury to decide. That the theories put forward by Shaw contradicted the State's theory did not render the evidence presented by the State as to Shaw's guilt insufficient as a matter of law. See *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

Moreover, the State presented numerous items of evidence that were collected from Shaw's house and the crime scene connecting him to Elizabeth's death; testimony regarding the long history of controlling, threatening, and abusive conduct by Shaw toward Elizabeth (including an intense encounter the morning Elizabeth was killed, witnessed by Shaw's daughter); testimony that Shaw gave conflicting accounts of events to police; and similar transaction evidence regarding a prior series of violent domestic incidents between Shaw and Kolb. The State also presented evidence that Shaw was the last person seen with Elizabeth before her death. See *Winston v. State*, 303 Ga. 604, 607 (814 SE2d 408) (2018) (circumstantial evidence supporting murder conviction included evidence that the defendant was "the last person known to be with the victim at the time the killing took place"). In sum, "[t]his evidence, though circumstantial, was very strong." *Carter v. State*, 305 Ga. 863, 868 (2) (828 SE2d 317) (2019).

Additionally, while detailing the investigative steps taken by Lynn that caused her to focus on Shaw as a suspect (and to exclude

others as potential suspects), the State offered evidence that specifically rebutted the assertion that Elizabeth had been seen two days before her body was found by law enforcement. The medical examiner and the forensic anthropologist testified that the state of decomposition in which Elizabeth's body was found was inconsistent with a theory that she had been alive as recently as two days before her body was discovered and that it was more likely that she had been dead for close to a week by the time her body was discovered on September 6. The State also established that Miles, the witness who had allegedly seen Elizabeth, had vision problems.

Under former OCGA § 24-4-6, the evidence presented at trial was legally sufficient to authorize a rational trier of fact to find that every reasonable hypothesis other than Shaw's guilt had been excluded. Thus, the jury was authorized to find beyond a reasonable doubt that Shaw was guilty of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. *Waiver of Counsel at Pre-Trial Hearing.*

Shaw argues that the trial court erred by requiring him to proceed pro se during a pre-trial evidentiary hearing. He contends that this was a critical stage of the proceedings for which he was entitled to counsel under the Sixth Amendment and that the trial court erred by not continuing the pre-trial hearing until Shaw could retain new counsel.  We find no error in the trial court's decision.

The trial court held a pre-trial hearing on Friday, October 16, 2009, regarding the admission of similar transaction evidence the State planned to enter against Shaw. In the same hearing, the trial court also conducted a *Jackson-Denno* hearing in regard to statements Shaw made to law enforcement.[9] The trial was set to begin the following Monday. In the week leading up to the hearing, Shaw's two attorneys filed motions to withdraw from representing him after Shaw fired them. At the hearing, Shaw told the trial court that he intended to represent himself at trial in the event the trial

---

[9] See *Jackson v. Denno*, 378 U. S. 368, 380 (84 SCt 1774, 12 LE2d 908) (1964).

28

court did not grant a continuance. The prosecutor argued that a continuance should not be granted because of Shaw's actions.

Shaw has used the services of several attorneys during this case. On October 5, 2007, Shaw retained an attorney, Ed Morrison, to represent him in a bond hearing and preliminary hearing. Shaw was indicted roughly five months later. Morrison was retained solely to represent Shaw in the pre-indictment hearings, and his representation of Shaw terminated when the hearings concluded.

Shaw then hired attorney Frank Smith, who filed an entry of appearance in May 2008. Smith represented Shaw in a proceeding to modify a bond order. Smith then referred Shaw to Lee Cannon, who entered an appearance in July 2008 and appeared at an August 2008 calendar call on Shaw's behalf. Cannon asked the court for a one-term continuance, which it granted, setting the case for trial in February 2009. In December 2008, Cannon withdrew from the representation because he and Shaw did not agree on how to prepare the case. At the pre-trial hearing, Shaw confirmed that he had some disagreements with Cannon, but he also told the court that he did

not have the money at that time to pay Cannon.

In January 2009, following Cannon's withdrawal, Shaw hired two new attorneys, Glenn Cheney and Kendall Gross, and they asked for another continuance in order to prepare for trial (which the trial court granted). In June 2009, the trial was specially set for October 19, 2009. Cheney and Gross represented Shaw until October 12, 2009, when they moved to withdraw as counsel.

The State argued that the continuance Shaw sought at the October 16 hearing would be extremely prejudicial to its case, due to problems with the availability of witnesses, specifically a GBI employee who was to testify as to the identity of the victim based on an analysis of the remains (but who was soon to deploy for military service) and Blaxton and Williamson (both of whom were of advanced age and suffered from significant health issues that might prevent them from later testifying). The State also noted that a number of its witnesses resided outside Georgia and that it would be challenging to reschedule their appearances if the trial was postponed. The State argued that because of these issues and

because Shaw had engaged in a pattern of dilatory conduct, the trial court should not grant his motion for a continuance.

The trial court agreed that the State would be prejudiced by further delay in the case, and it found that Shaw had engaged in a pattern of dilatory tactics by dismissing counsel at various stages of the proceedings. The trial court noted that, months before, at the request of Shaw's attorneys, the case had been specially set for trial. The trial court also advised Shaw of the dangers and disadvantages of representing himself at trial should he choose to terminate the services of his current attorneys. Shaw reiterated to the trial court that he would prefer to have counsel represent him at trial, and he told the trial court that he was not seeking to dismiss his counsel in order to delay the trial.

However, the trial court determined that it would permit Shaw's attorneys, Cheney and Gross, to withdraw from the case and that Shaw could represent himself because he had effectively waived his right to counsel. The trial court also appointed a public defender, Steve Harrison, to provide technical advice to Shaw during the

31

hearing. The trial court then proceeded with the *Jackson-Denno* hearing and the hearing on the similar transaction evidence, ruling that each item of contested evidence addressed in the hearings would be admitted.[10]

"A criminal defendant's [Sixth Amendment] right to counsel attaches after the onset of formal prosecutorial proceedings and continues through all critical stages of the proceeding brought against him." (Citations omitted.) *Lowery v. State*, 282 Ga. 68, 74-75 (4) (b) (ii) (646 SE2d 67) (2007). A pre-trial hearing on a motion to admit or exclude evidence at trial is a critical stage of the proceedings. See *United States v. Hamilton*, 391 F3d 1066, 1070 (II) (9th Cir. 2004) (recognizing that a pre-trial hearing regarding admissibility of evidence is a critical stage of the proceeding); *Smith*

---

[10] For reasons not apparent from the record, Shaw's trial did not go forward the following Monday as scheduled. Shaw later retained new counsel, Tina Maddox, who, in December 2009, filed a motion in limine and a motion seeking rehearing on the similar transaction evidence the trial court admitted at the pre-trial hearing. Prior to the start of Shaw's trial, Maddox (and her co-counsel, Lance Hamilton) were given an opportunity to re-argue the admission of the similar transaction evidence. The trial court denied the motion for reconsideration. It does not appear that Shaw's trial counsel made any request that the trial court reconsider its ruling as to the admissibility of Shaw's statements to law enforcement.

*v. Lockhart*, 923 F2d 1314, 1318-1319 (II) (A) (8th Cir. 1991) (omnibus pre-trial hearing at which trial court considered motions in limine was a critical stage of proceedings). However, even at critical stages of a criminal proceeding, a defendant's Sixth Amendment right to counsel can be waived so long as such waiver is "knowing and voluntary." *Jones v. Terry*, 279 Ga. 623, 624 (619 SE2d 601) (2005). Where the discharge and employment of other counsel is used as a dilatory tactic, this Court has found such action to be the functional equivalent of a knowing and voluntary waiver. *Hobson v. State*, 266 Ga. 638, 638 (2) (469 SE2d 188) (1996).

Here, Shaw moved for a continuance to obtain new counsel at the start of a pre-trial motion hearing held on the Friday before the Monday on which jury selection was to commence. At that point, Shaw's case had been pending for over a year and a half. The trial court had granted multiple continuances at the request of Shaw's series of attorneys, and the trial had been specially set to accommodate the schedules of the counsel he employed up until the week leading up to the trial. In light of these circumstances, the trial

33

court was authorized to conclude that Shaw waived his right to counsel at the pre-trial hearing and that his request for continuance should be denied. *Hobson*, 266 Ga. at 638 (2). This enumeration of error therefore fails.

3. *Doris Kolb's Testimony*.

Shaw argues that the trial court erred by admitting similar transaction evidence through the testimony of Doris Kolb. Because Shaw objected to the admission of Kolb's testimony, we review the trial court's decision to admit it for abuse of discretion. *Pareja v. State*, 286 Ga. 117, 121 (686 SE2d 232) (2009).

> Under the evidence rules in effect at the time of Shaw's trial,
>
> [b]efore evidence of prior crimes [was] admissible, the trial court [was required to] determine that the State [had] affirmatively shown that: (1) the State [sought] to admit evidence of the independent offenses or acts for an appropriate purpose; (2) there [was] sufficient evidence that the accused committed the independent offenses or acts; and (3) there [was] sufficient connection or similarity between the independent offenses or acts and the crimes charged so that proof of the former [tended] to prove the latter.

(Citation omitted.) *Palmer v. State*, 271 Ga. 234, 239 (8) (a) (517

34

SE2d 502) (1999). See also former Uniform Superior Court Rule 31.3 (B). Under the prior rules, "evidence of independent offenses committed by a defendant [was generally] irrelevant and inadmissible in a trial for a different crime." *Pareja*, 286 Ga. at 119. See also former OCGA § 24-2-2. "In some cases, however, evidence of similar crimes (or transactions) [was] admissible where its relevance to show identity, motive, plan, scheme, bent of mind and course of conduct, outweigh[ed] its prejudicial impact." (Citations and punctuation omitted.) *Pareja*, 286 Ga. at 119.

Here, at the pre-trial hearing, the State argued that it sought to introduce Kolb's testimony regarding one incident in which Shaw burned her possessions and a separate incident in which he choked and threatened her and later broke down the door of her house in order to establish Shaw's bent of mind or course of conduct. Under the former evidence rules, these were proper purposes for which this evidence could be introduced. Moreover, the trial court was authorized to determine that Shaw had committed the acts to which Kolb testified. Both her testimony and that of Merle Richardson

35

established that Shaw had burned Kolb's possessions in his yard, and the trial court was authorized to determine that Kolb's testimony about the choking incident was sufficient to prove that Shaw had committed the acts.

The trial court was also authorized to determine that the relevance of these incidents to Shaw's course of conduct and bent of mind outweighed the prejudicial impact of the evidence. As we have previously discussed,

> in cases of domestic violence, prior incidents of abuse against family members or sexual partners are more generally permitted because there is a logical connection between violent acts against two different persons with whom the accused had a similar emotional or intimate attachment.

(Citation and punctuation omitted.) *Hall v. State*, 287 Ga. 755, 757 (2) (699 SE2d 321) (2010) (overruled on other grounds by *Durden v. State*, 293 Ga. 89 (744 SE2d 9) (2013)). Thus, the trial court did not abuse its discretion when it determined that Shaw's prior acts against Kolb were sufficiently similar to show Shaw's course of conduct or bent of mind to react violently when upset with a woman

with whom he had an intimate relationship. Moreover, the time frame between the 1998 incidents Kolb testified to and Elizabeth's 2007 death was not so remote as to negate the relevance of Kolb's testimony, especially in light of the fact that the prior acts were made against an intimate partner. See *Hall*, 287 Ga. at 757 (2).

Based on the foregoing, we find no abuse of discretion in the trial court's admission of Kolb's similar transaction testimony. This enumeration of error therefore fails.

4. *Tammy Ward's Testimony*.

Shaw argues that the trial court erred by admitting improper character evidence through the testimony of Tammy Ward. Specifically, Shaw takes issue with Ward's statement that Shaw would "get so mean he was so bad he'd go hit the little boy." Because Shaw objected to the admission of this statement, we review the trial court's decision to admit it for abuse of discretion.

Under the former evidence rules, this Court has noted:

> Unlike similar transactions, prior difficulties do not implicate independent acts or occurrences, but are connected acts or occurrences arising from the

relationship between the same people involved in the prosecution and are related and connected by such nexus. Thus, the admissibility of evidence of prior difficulties does not depend upon a showing of similarity to the crime for which the accused is being tried. Evidence of the defendant's prior acts toward the victim, be it a prior assault, a quarrel, or a threat, is admissible when the defendant is accused of a criminal act against the victim, as the prior acts are evidence of the relationship between the victim and the defendant and may show the defendant's motive, intent, and bent of mind in committing the act against the victim which results in the charges for which the defendant is being prosecuted.

(Citations and punctuation omitted.) *Parker v. State*, 296 Ga. 199, 204 (3) (766 SE2d 60) (2014).

Here, Ward's testimony recounted something Elizabeth had previously told her about Shaw. Specifically, Ward testified that Elizabeth said that Shaw was mean to her and that, at times, when Shaw had been drinking, "he would get so mean . . . he'd go to hit [his young son] and [Elizabeth would] stand in front of him and he would hit her." Although this statement touches on an act Shaw committed against his son, it was offered by the State to illustrate Shaw's behavior toward Elizabeth—namely, that Shaw would hit Elizabeth if she prevented him from hitting his son. Because this

38

statement pertained to prior difficulties between Shaw and Elizabeth, the trial court did not abuse its discretion in admitting it over Shaw's objection.

5. *Jamie Richardson's Testimony*.

Shaw argues that the trial court erred by admitting the testimony of Jamie Richardson regarding the phone conversation he had with Shaw in which Shaw told him that he was going to kill Elizabeth. As with Tammy Ward's testimony, however, Jamie Richardson's testimony pertained to the prior difficulties between Shaw and Elizabeth. Jamie's testimony was illustrative of Shaw's frustration with Elizabeth over his inability, in the words recounted by Jamie Richardson, to "control" her. Shaw further evidenced that frustration by telling Jamie Richardson that he would kill Elizabeth. That this threat was not communicated to Elizabeth at the time is irrelevant to the question before us because Shaw's statements went to the difficulties in the relationship between Shaw and Elizabeth. As such, the trial court did not abuse its discretion by admitting Jamie Richardson's testimony over Shaw's objection.

6. *Claims of Ineffective Assistance of Counsel.*

Shaw argues that his trial counsel was ineffective by failing to object to the testimony of two witnesses, by failing to cross-examine Leanne Shaw, and by failing to call any defense witnesses. To prevail on his claim of ineffectiveness, Shaw

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Shaw] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Shaw] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citations and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)).

"A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d

906) (2016). Moreover, "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." (Citation and punctuation omitted.) *Davis v. State*, 299 Ga. 180, 183 (787 SE2d 221) (2016). With these principles in mind, we consider each of Shaw's claims of ineffective assistance in turn.

(a) *Failure to Object to Testimony of Deputy Craven.*

Shaw argues that his trial counsel performed deficiently by failing to object to Deputy Craven's statements about responding to two calls to police about altercations between Elizabeth and Shaw. Shaw argues that Craven's testimony included hearsay statements that would not have been admitted had his trial counsel objected.

When discussing the first call, Craven recalled that police were called because "[Shaw] was trying to get into the victim's mother's house through a window. We went out that night. And he had already made it back home by the time we got there. He had already walked to his residence." As to the second call Deputy Craven

responded to, he testified that, "Then another time [Elizabeth] had called from her mother's residence on a cell phone in reference to him chasing her around with a hammer." Craven testified that in response to the call, he spoke with Shaw, who told him that he and Elizabeth had been arguing but that it was "nothing major." Craven testified that he had never seen Shaw with any tools or weapons but that it was "not uncommon" to receive calls involving Shaw. Shaw's trial counsel did not object to Craven's statement about the call placed by Elizabeth or to the additional details Craven gave about his response to the call. However, Shaw's counsel cross-examined Craven about this second incident and used that cross-examination to establish that Craven did not file a report of the call because he did not deem it to be a serious incident or that, if he had, it had been lost by the sheriff's office.

Here, it appears that Shaw's counsel used the cross-examination of Craven not only to downplay the severity of the incidents Craven described but also to suggest that the sheriff's department was not diligent or effective. This was in keeping with

the overall trial strategy, as outlined in Shaw's counsel's opening statement and closing argument, of attacking the thoroughness of law enforcement's investigation of Elizabeth's death.

Moreover, to the extent some of the details offered by Craven regarding these calls constituted hearsay, there was no prejudice arising from Shaw's trial counsel's failure to object on that basis because of the significant volume of prior difficulties evidence otherwise offered by the State. The incidents described by Craven were among the many instances of conflict between Shaw and Elizabeth put forward by the State, and because of that, we cannot say that there is a reasonable probability that the failure to object to these two statements had any effect on the outcome of the trial. See *Mathis v. State*, 291 Ga. 268, 270 (2) (728 SE2d 661) (2012) (harmless error in admission of hearsay testimony regarding prior difficulties between defendant and victim where other admissible evidence established difficulties between defendant and victim). This claim of ineffective assistance therefore fails.

(b) *Failure to Object to Williamson's Testimony*.

43

Shaw also argues that his trial counsel should have objected to Deavis Williamson's testimony, which recounted an incident in which she observed Elizabeth running to her house without any clothing and claiming that she had been raped. Shaw argues that because the only connection between this incident and Shaw was that Williamson claimed that Shaw drove by while Elizabeth was at her house, this testimony was improper character evidence that would have been excluded had Shaw's trial counsel objected.

As with Deputy Craven's testimony, Shaw's trial counsel cross-examined Williamson about the incident to which she testified. In that line of questions, Williamson clarified that, when Elizabeth came to her house, she did not call the police and that Elizabeth had not asked her to. Williamson elaborated that she had asked Elizabeth if she wanted to go to the hospital and that Elizabeth declined. Williamson also testified that she did not see any cuts or bruises on Elizabeth. She also stated that when Shaw drove by her house, he left when Elizabeth "waved him on," that he did not come up to Williamson's door, and that he did not appear to be threatening

Elizabeth.

It thus appears that Shaw's counsel elected to downplay the impact of Williamson's testimony by eliciting further details about the incident—and Shaw's lack of explicit connection to it—through cross-examination. Additionally, in closing argument, Shaw's counsel referenced Williamson's testimony by noting that Shaw's nervous behavior around the police could be explained because Elizabeth had previously alleged that he raped her. On the record before us, we cannot say that no reasonable attorney would have chosen to handle Williamson's testimony in this manner. Thus, because we cannot say that Shaw's trial attorneys performed deficiently, this claim of ineffective assistance fails.

(c) *Failure to Cross-Examine Leanne Shaw and to Introduce Evidence Impeaching Her Testimony.*

Shaw further contends that his trial counsel performed deficiently by failing to cross-examine Leanne Shaw. Specifically, Shaw argues that his trial counsel should have attempted to cross-examine Leanne in order to probe the basis of her testimony,

45

including the vantage point from which she witnessed the argument between Shaw and Elizabeth the morning of September 1. Shaw also argues that his counsel should have attempted to impeach Leanne's testimony with evidence of circumstances that would have shown a reason why she would have wanted to testify in favor of the State.

At the hearing on Shaw's motion for new trial, Shaw's appellate counsel argued to the trial court that Leanne may have been in jail on drug charges at the time she testified for the State at Shaw's trial. Appellate counsel also questioned the credibility of Leanne's testimony, noting that cross-examination might have revealed how she was in a position to view the argument between Shaw and Elizabeth on the morning of September 1.

But appellate counsel made no attempt to place any testimony in the record at the hearing as to what Leanne might have testified to had she been cross-examined or whether she in fact had an incentive to testify for the State due to pending criminal charges. Neither Leanne nor either of Shaw's trial attorneys were called to testify at the hearing. The only testimony presented at the hearing

was that of Shaw, who stated that his other daughter, Amy Soots, had information regarding the truthfulness of the statements that Leanne made at trial. Shaw did not elaborate as to what Soots would have testified had she been called at trial, and Shaw offered no other testimony regarding other evidence that could have been used to show that Leanne had an incentive to testify for the State, as Shaw's appellate counsel alleged. Shaw has therefore not carried his burden of demonstrating on the record that his trial counsel performed deficiently by not impeaching Leanne's testimony at trial or by cross-examining her. See *State v. Mobley*, 296 Ga. 876, 877 (770 SE2d 1) (2015) ("[A] silent or ambiguous record is not sufficient to overcome the strong presumption of reasonable performance." (citation omitted)).[11] This claim of ineffective assistance therefore

---

[11] It is not clear from the record before us how cross-examination regarding the foundation of Leanne's testimony and the vantage point from which she viewed these events might have helped Shaw's case. Moreover, it is possible that cross-examination about the incident might have actually been harmful. Further testimony from Leanne would have prolonged the time at trial devoted to the incident and could have solidified for the jury that the events unfolded as Leanne described. Because she was not called to testify at the hearing on the motion for new trial, there is no indication in the record that prompting Leanne to provide further details about the incident was good for Shaw's case.

fails.

    (d) *Failure to Present Any Defense Witnesses.*

After the close of the State's evidence, the trial court informed Shaw of his right to testify or not testify and that the jury would be instructed that his lack of testimony could not be used against him. He was also informed that it was his choice, not his lawyer's, as to whether he would testify, but that if he did elect to testify he would be subject to cross-examination by the State. Shaw indicated that he understood each of these rights. After a brief recess in which Shaw met with his counsel, Shaw's counsel asked for a recess until the following morning so that Shaw could further consider the question of whether to testify. During a discussion on that issue between Shaw's counsel, the prosecutor, and the trial court, Shaw's counsel told the trial court that he did not anticipate that Shaw would be presenting any other evidence. The trial court decided to continue the case until the morning to give Shaw an opportunity to consider whether to testify. When the trial reconvened the following morning, Shaw elected not to testify, and his trial counsel rested without

calling any witnesses. Shaw now contends the decision to rest without calling witnesses constituted deficient performance.

At the hearing on his motion for new trial, Shaw testified that his trial attorneys subpoenaed witnesses that they planned to call to testify. Shaw claimed to have been surprised that they were not called to testify, noting that at lunch during a break in Lynn's testimony, there had been no mention from his attorneys that they were not going to call witnesses. He claimed to be in "total shock" when his attorneys announced to the trial court that they would be calling no witnesses. Shaw then suggested that the testimony of several witnesses he identified would have helped his case.

> [T]rial counsel's decision as to which defense witnesses to call is a matter of trial strategy and tactics, and tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances.

(Citation and punctuation omitted.) *Cato v. State*, 304 Ga. 496, 501 (3) (820 SE2d 41) (2018). Although Shaw testified at the hearing and gave a brief summary of what he expected those witnesses would

49

have testified to, that alone does not satisfy his burden to show that his trial counsel's decision was patently unreasonable. In the absence of actual evidence about the testimony those witnesses would have provided, Shaw has not overcome the presumption that his attorneys made a reasonable strategic choice by not calling any of the witnesses Shaw identified. See *Foreman v. State*, 306 Ga. 567 (3) (832 SE2d 369) (2019) (no showing of deficiency or prejudice where potential witness was not called to testify at hearing on motion for new trial and nothing in the record established that the witness's testimony would have aided the defense). See also *Washington v. State*, 294 Ga. 560, 565-566 (3) (755 SE2d 160) (2014) (no showing of prejudice where appellate counsel failed to call witnesses who were other potential suspects to testify on motion for new trial). Accordingly, this claim of ineffectiveness fails.

*Judgment affirmed.  All the Justices concur.*

DECIDED OCTOBER 31, 2019.

Murder. Montgomery Superior Court. Before Judge Kaufold.

*Steven M. Harrison*, for appellant.

*Timothy G. Vaughn, District Attorney, Keely K. Pitts, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General*, for appellee.