309 Ga. 473
FINAL COPY

S20A0688.  CLARK v. THE STATE.

WARREN, Justice.

Rodney Carter Clark was convicted of malice murder and other crimes in connection with the shooting death of Mario Johnson.[1]  On appeal, Clark contends only that the evidence was insufficient to sustain his convictions.  We disagree and affirm.

---

[1] The crimes were committed in the early morning hours of November 15, 2015.  A Newton County grand jury first returned an indictment in this case on February 5, 2016, but on April 1, 2016, the grand jury re-indicted Clark for malice murder, two counts of felony murder, armed robbery, aggravated assault, possession of cocaine, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon.  At a trial held from October 9 to 13, 2017, a jury found Clark guilty of all counts.  On November 17, 2017, the trial court sentenced Clark to life in prison for malice murder, a concurrent life sentence for armed robbery, concurrent terms of three years for possession of cocaine and five years for possession of a firearm by a convicted felon, and a consecutive term of five years for possession of a firearm during the commission of a felony.  The felony-murder verdicts were vacated by operation of law, and the aggravated-assault count was merged into the malice-murder conviction.  Clark filed a timely motion for new trial on December 4, 2017, which was later amended on March 15, 2019.  The amended motion was denied on July 19, 2019, and Clark filed a timely notice of appeal on August 15, 2019.  The case was docketed in this Court for the April 2020 term and submitted for a decision on the briefs.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at Clark's trial showed that, on November 14, 2015, Clark was drinking at his house with his girlfriend, Kimberly Lewis,[2] and Anthony Freeman. That evening, Clark asked Freeman to drive him to a residence where he could purchase marijuana from Johnson. Clark and Freeman left in Lewis's car. Lewis phoned to inform Johnson that Clark was en route to Johnson's house. Clark had a tote bag with him.

When Clark and Freeman arrived, Freeman stayed in the car, and Clark entered Johnson's house through the front door. After two or three minutes, Freeman heard two gunshots and left. Freeman heard additional gunshots as he approached the stop sign at the end of the street but did not call the police. Freeman noticed a black SUV pulling into Johnson's driveway as he left the neighborhood.

Leonard Gaither had driven his black SUV to Johnson's house to purchase marijuana from Johnson that same night. Because a

<hr>

[2] Kimberly Lewis testified that she is now known as Kimberly Franklin.

running car with its headlights on was in the driveway, Gaither waited at the end of the street for the car to leave and then pulled into the driveway. When he arrived, Gaither noticed that the front door to the house was open and exited his car. As he approached, Gaither heard moaning and saw someone lying on the front porch. Gaither recognized the man as Johnson but was unaware that Johnson had been shot. Gaither saw Clark standing inside the house and saw a pistol lying three feet inside the door. Clark, who had been shot in the thigh, told Gaither that "they shot him too" and asked Gaither to give him a ride and not to call the police. Gaither agreed. Gaither saw a van pulling around the back of Johnson's house as he and Clark left. During the ride, Clark gave Gaither some marijuana from the tote bag he was carrying, and Gaither dropped Clark off at Clark's house. The next day, Gaither contacted a law enforcement officer to explain what had happened, and he was interviewed at the Newton County Sheriff's Office.

After Clark had been dropped off at his house, Freeman arrived at Clark's house to return Lewis's car. Clark met Freeman in the

yard and threatened to kill Freeman if he said anything about the incident. Clark also threatened to kill Lewis.

Shortly after the incident, Johnson's best friend, Quentin Sims, arrived at Johnson's house after being notified of the shooting. Sims met Johnson's brother, Joeston, and two others at the house. Sims spoke to Johnson, who was lying outside the front door, but received no response. Sims noticed that the garage door was closed, which was consistent with testimony from other witnesses and law enforcement officers who arrived at the scene later. Sims also noticed that the .40-caliber pistol that Johnson often carried was lying inside the front door. After two or three minutes, Joeston called the police.

When law enforcement arrived, two deputies noticed Johnson lying outside the front door; he was not moving. Sims, who testified that Johnson had many enemies from selling drugs, also testified that some of Johnson's customers used the back door, and Gaither testified that he had purchased drugs by going to the back door in other dealings with Johnson. But crime scene photographs showed

that the back door remained locked with a deadbolt, and a responding officer testified that she would not have unlocked and re-locked a door. Additionally, the front and back doors of the house were equipped with burglar doors consisting of metal bars to add extra protection outside the home's traditional doors, and the back burglar door generally "would stay locked."

An investigator who went to the crime scene asked several people to come to the sheriff's office to be interviewed. As part of the ongoing investigation into Johnson's shooting, investigators also visited Clark at his house late on November 15, 2015. There, they found three .32-caliber shell casings inside a trash can on top of Clark's other trash, as well as cocaine and drug paraphernalia in a bedside table. No gun was recovered.

An investigator and a corporal interviewed Clark on November 15, 2015, at the sheriff's office. Clark admitted that he was at Johnson's house on the night of the murder, and told the officers that while he was sitting at Johnson's kitchen table, there was a knock on the back door. According to Clark, a man whom Clark did not

know entered the residence, and after a couple of minutes, shooting erupted between the man and Johnson. Clark claimed that he sustained a bullet wound when the man shot back inside the house while running out of the front door. Clark said that he then ran to the garage, fumbled with the garage door opener, and ran out of the garage before getting a ride home with Gaither. Clark explained that afterward, he went with Lewis to her house in another county and threw the jeans he was wearing into a trash can on a nearby street.

At trial, Clark's cousin, Charles Carter, testified that he kept a .32-caliber revolver that belonged to Clark at his home for about a year or so, but Carter no longer possessed it. Carter identified the gun as a .32-caliber revolver that he thought held five bullets. Carter originally told an investigator that Clark retrieved the gun on November 14 or 15, but Carter testified at trial that he did not remember specifying a date when Clark retrieved it. Marvin Johnson, another cousin of Clark's who was also a distant cousin of Johnson's, testified that Clark told him around 8:00 to 9:00 on the

morning of November 15 that Clark needed to go get "his s***," which is what he called his revolver when asking Carter for it.

Dr. John Wassum, an associate medical examiner with the GBI, was qualified as an expert in forensic pathology. He testified that five bullets were recovered from Johnson's body and that one bullet went through his ear and was not recovered. Dr. Wassum testified that the cause of death was exsanguination as a result of multiple gunshot wounds.

Christine Lavoic, a forensic DNA analyst with the GBI, was qualified as an expert in forensic biology and specifically in DNA testing. She testified that swabbings of the bloodstains found on Johnson's kitchen floor matched Clark's DNA; that DNA obtained from the handle of the .40-caliber pistol recovered at the scene matched Johnson's DNA; and that the slide of the .40-caliber pistol contained DNA from at least four people, but no conclusive DNA matches could be made.

Lindsey Shelton, a latent fingerprint examiner with the GBI, was qualified as an expert and testified that two items found in

Johnson's house (a cup from a Wendy's restaurant and an extended magazine for the .40-caliber pistol) contained fingerprints that matched Sims's fingerprint card. The fingerprints of Brandon Cobb, Johnson's brother, were also found on the side of a beer can found in Johnson's house. Both Sims and Cobb testified at trial that they were in Johnson's home in the days leading up to Johnson's murder. And Sims testified to previously touching the .40-caliber gun recovered from the scene.

Julie Riley, a firearms examiner with the GBI, was qualified as an expert in firearms identification. She testified that five .40-caliber cartridge cases, one .40-caliber metal jacket, and one .40-caliber metal jacketed bullet were collected from the crime scene and that each was fired from the .40-caliber pistol that was lying inside the door of Johnson's house. Riley also testified that the five .32-caliber bullets recovered from Johnson's body and two .32-caliber bullets recovered from the crime scene were fired from the same .32-caliber revolver that had seven or eight chambers. She also testified that the three .32-caliber shell casings that were recovered from the

trash can in Clark's house were all fired from the same .32-caliber revolver, but was unable to conclude whether they were fired from the same .32-caliber revolver that fired the .32-caliber bullets recovered from Johnson's house without being able to test that specific revolver.

Clark contends that the evidence was insufficient to support his convictions because the State's case was based on circumstantial evidence and the State failed to exclude the reasonable explanation of events Clark provided. When evaluating challenges to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable to the jury's verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith v. State*, 308 Ga. 81, 84 (839 SE2d

630) (2020), and we do not reweigh the evidence, *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019). "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Jackson v. State*, 307 Ga. 770, 772 (838 SE2d 246) (2020) (citation and punctuation omitted). "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." *Smith*, 308 Ga. at 84 (citation and punctuation omitted).

Moreover, "the fact that the evidence of guilt was circumstantial does not render it insufficient." *Carter v. State*, 305 Ga. 863, 867 (828 SE2d 317) (2019) (citation and punctuation omitted). It is true that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. But we have made clear that "[n]ot every hypothesis is reasonable," so "only reasonable hypotheses" must be excluded. *Brown v. State*,

304 Ga. 435, 437 (819 SE2d 14) (2018). In other words, the evidence "need not exclude every *conceivable* inference or hypothesis—only those that are reasonable," *Carter*, 305 Ga. at 868 (citation and punctuation omitted; emphasis in original), and "it is principally for the jury to determine whether an alternative hypothesis is reasonable." *Willis v. State*, 304 Ga. 781, 783 (822 SE2d 203) (2018).

Here, the evidence presented at trial and outlined above was more than sufficient for a rational trier of fact to have found Clark guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson*, 443 U.S. at 319. Clark, however, also argues that the jury was unreasonable when it rejected the alternative hypothesis he presented at trial. That alternative hypothesis is based on Clark's statement to law enforcement that after he went into Johnson's house, a man came through the back door, began exchanging gunfire with Johnson, and then ran out the front door— thus shifting the blame to another person for Johnson's murder. In support of this theory, Clark points to evidence such as his cousin's testimony showing that Clark likely did not retrieve his .32-caliber

revolver until the day of the shooting, but at a time after the shooting occurred, combined with the absence of any evidence that Clark was seen with a gun on the night of the murder; his cousin's belief that the revolver had only five chambers, in contrast to expert testimony that the .32-caliber revolver discharged at the scene of Johnson's murder had seven or eight chambers; testimony that some bullets struck Johnson in different trajectories and the inference that they therefore may have come from more than one gun; testimony that a van was seen pulling behind Johnson's house, that some of Johnson's customers would use his back door, and that Johnson had enemies; the discovery of fingerprints of people other than Johnson on Johnson's .40-caliber pistol and other items in his house; and the lack of any evidence that Clark had a motive to shoot Johnson beyond the robbery motive that a number of other people could have had toward Johnson, a known drug dealer.

But all of the evidence supporting Clark's alternative hypothesis can be characterized as presenting inconsistencies in the evidence, evidence that required assessment of a witness's

credibility, or inferences that could be drawn from the evidence presented at trial, and "[w]e leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith*, 308 Ga. at 84. Under these circumstances, "it was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence" and "to decide whether the defense theory that an unknown assailant was the killer was reasonable and not excluded by the other evidence." *Bamberg v. State*, 308 Ga. 340, 343 (839 SE2d 640) (2020) (citation and punctuation omitted).

The evidence presented at Clark's trial was legally sufficient to exclude every reasonable hypothesis other than Clark's guilt. See *Carter*, 305 Ga. at 868 ("Where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of the guilt of the accused, we will not disturb that finding unless it is insupportable as a matter of law.") (citation and punctuation omitted); *Dixon v. State*, 298 Ga.

200, 203 (779 SE2d 290) (2015) (circumstantial evidence supporting murder conviction included the defendant's presence in an apartment for a drug deal when two people were shot and killed, his quick departure with his co-defendant, with whom he shared a residence, and the discovery of ammunition of the type used to kill one of the victims in the co-defendant's car). We therefore affirm Clark's convictions.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.
Murder. Newton Superior Court. Before Judge Johnson.
*Jennifer F. Arndt*, for appellant.
*Layla H. Zon, District Attorney, Randal M. McGinley, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.