310 Ga. 797
FINAL COPY

S20A1157.  CARSTON v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Jerry Carston was convicted of malice murder and related firearm and gang crimes after he shot and killed Quinton Williams, who had left Appellant's gang. In this Court, Appellant argues that the trial court erred by supposedly preventing his counsel from questioning one of the State's witnesses about pending felony charges and by admitting into evidence a video recording of a gang beating of Williams that did not involve Appellant. We conclude that Appellant has not shown that the trial court imposed any unreasonable limitation on questioning the State's witness and that the video was properly admitted, so we affirm.[1]

---

[1] The crimes occurred on July 24, 2016. In October 2016, a Troup County grand jury indicted Appellant for malice murder, possession of a firearm during the commission of a felony, possession of a handgun by a person under 18 years old, and six counts of violating the Georgia Street Gang Terrorism and Prevention Act. The murder and the two gun charges each were the predicate for two gang charges: one for "participat[ing] in criminal gang

1. When viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following. In the early evening of July 24, 2016, Corderde'z Robinson was driving a car in LaGrange with Appellant, who was then 15 years old and a member of the Bishop Bloods gang, a subset of the national Bloods gang that has about 40 members in Troup County. Appellant used Robinson's cell phone to send a series of text messages to Appellant's girlfriend, Miracle Ramsey. Phone records show that Appellant

activity" in violation of OCGA § 16-15-4 (a) and one for committing an offense to "increase [Appellant's] status or position in a criminal street gang" in violation of OCGA § 16-15-4 (b). Miracle Ramsey was indicted with Appellant for malice murder and two gang charges; as part of a negotiated guilty plea, she agreed to testify truthfully at Appellant's trial, pled guilty to aggravated assault, and was sentenced to serve fifteen years in prison and five years on probation. Appellant was tried from August 21 to 24, 2017. The jury found him guilty of all counts, and the trial court sentenced him to serve life in prison for malice murder; twenty years in prison for each of the six gang counts, with two of those sentences consecutive and the remaining four concurrent; five consecutive years for possession of a firearm during the commission of a felony; and five concurrent years for possession of a handgun by a person under 18 years old. Appellant filed a timely motion for new trial, which he amended with new counsel in April 2019. After a hearing, the trial court denied the motion in December 2019. Appellant then filed a timely notice of appeal, and the case was docketed to the August 2020 term of this Court and submitted for a decision on the briefs.

2

asked Ramsey to "do [him] a favor" and "set . . . up" Williams. When Ramsey replied that she was busy, Appellant said that it would be "quick" and he "need[ed] this for another stain."[2] Ramsey then agreed and asked for details about what she was supposed to do. Appellant answered, "Ima tell ya but do you no he gotta die right." Appellant said he would pick up Ramsey, telling her it was "just me & my bishop" in the car.

After Appellant and Robinson picked up Ramsey, they drove to an apartment complex on North Cary Street. Robinson, who was good friends with Williams, saw Williams at the apartment complex, got out of the car, and talked to him briefly, while Appellant and Ramsey waited in the car. When Robinson got back in the car, Appellant asked if that was Williams, and Robinson said yes. Appellant then told Robinson to drive a little further into the apartment complex and used Robinson's phone to call Jamius

---

[2] Robinson testified that "stain" means rank in the gang, and the State's expert on gangs further explained that "earn[ing] stain" means "gain[ing] authority within the gang."

Gunsby, a higher-ranking member of the Bishop Bloods. Putting the call on speaker phone, Appellant asked Gunsby if Williams was a "dub," meaning someone who is not in the gang anymore; Gunsby said yes. Appellant asked if he had a "green light"; Gunsby again said yes.[3] Appellant then got out of the car.

Two witnesses testified about what they saw at the apartments that evening. A woman was outside near her apartment on North Cary Street when she saw a car come into the apartments' parking lot. A person wearing a black shirt, black Adidas pants, and something covering "between the face and neck area" got out of the car. The driver said something like, "There he is," or "Go get him." The witness turned away and then she heard a gunshot. Another woman, who lived in a house near the entrance to the apartments, looked out her window after she heard about four gunshots and saw

---

[3] Robinson understood the "green light" discussion to mean that Appellant could "proceed to fight" Williams. The gang expert testified that the phrase "green light" can be used "to get permission" to, among other things, "do harm . . . to another individual."

4

a young man lying on the ground and another young man, who looked like a teenager and was wearing a black t-shirt, running up the sidewalk on North Cary Street. She called 911.

Police officers found Williams lying dead on the sidewalk along North Cary Street. He died from five gunshot wounds, one in his jaw and four in his lower abdomen; five bullet casings were found near his body. The shots were fired from between a few inches and a few feet away. The medical examiner testified that the trajectories of the bullets were consistent with Williams lying on his back on the pavement when he was shot in the abdomen.

Robinson testified that after Appellant got out of the car, Robinson and Ramsey drove to a nearby store, where they stayed for a short time before driving back toward the apartment complex. They picked up Appellant after he ran out of the bushes; he then told Robinson to "Get me the 'F' out of here." Robinson saw that Appellant was holding a pistol and wearing a camouflage mask, a black long-sleeve shirt that said "Local Trap Star" in white writing,

and black pants. While laughing, Appellant told Ramsey that he had "shot somebody" for "gang-related" reasons.[4]

Robinson drove Appellant and Ramsey to the home of Christopher Love, another member of the Bishop Bloods gang. When they arrived, Robinson heard Appellant tell Love, "Man, I shot him, bro. . . . He ain't had nothing to do with it. I shot him, bro. I don't care," and, "Pete said we ain't dubbing him out the hood no more. We double-deucing him out the hood." Love told Appellant that he was "stupid," but Appellant said, "Man, he's just a free stain." Ramsey saw Appellant give the gun he had to Love.[5]

---

[4] A surveillance video recording from a business near the apartments shows Williams walking toward the apartments and then a car driving by in the same direction less than a minute later. The same car passes the camera again, driving in the opposite direction, about a minute and 20 seconds later. The car is off-screen for about two-and-a-half minutes before returning, waiting briefly in the driveway of a business across the street from the camera, and then driving toward a man running from the direction of the apartments wearing a black shirt with something white in the center. The man gets into the car, which drives away from the apartments.

[5] Robinson understood "dubbing" to mean fighting and "double-deucing" to mean killing. The gang expert testified that "Pete" was the head of the Bishop Bloods in Georgia. The expert also testified that being "dubbed out" sometimes means getting "blessed" out of the gang with no violence, while "double-deucing" means letting a former gang member "know that because

After visiting Love, Appellant and Ramsey parted ways with Robinson. Appellant and Ramsey went to his house, where he took a shower and then logged onto Facebook to watch for reports of Williams's death, laughing as he saw "RIP posts." Robinson went home, called his football coach Ricky Edmundson, and told Edmundson what had happened. The next day, they went to the police department and reported it. Police detectives obtained a search warrant for Appellant's house, where they found a camouflage neck gaiter, a long-sleeve black shirt that said "Local Trap Star" in white writing, and black Adidas pants. Later testing

they're no longer a part of us, they will bleed." The expert explained that the practice of "blood in, blood out" is common among Bishop Bloods members. "Blood in" means showing a willingness to bleed for the gang to show strength and loyalty, and "blood out" means that a member will have to "fight their way out" and is "going to bleed to get out of this gang, even death."

As discussed further in Division 3 below, the State introduced into evidence a video of Williams being "beat in" to the Bishop Bloods gang. The fact that Williams later left the gang was supported by testimony from Ricky Edmundson, a football coach who did outreach in the community and hired Williams. Edmundson testified that he knew that Williams had been in a gang and told Williams that he did not want "any kind of outside trouble." Williams responded that Edmundson "didn't have anything to worry about" and that "he was working on something." This conversation happened about a month before Williams was killed. Shortly after the conversation, Williams told Edmundson that he was "free."

showed that the shirt had gunshot primer residue on it, although the pants and gaiter did not.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's soon-to-end practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).[6]

---

[6] We remind litigants that this Court will end our practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that began in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

2. Appellant contends that the trial court violated his constitutional right to confront the witnesses against him by preventing him from cross-examining Robinson about unrelated pending felony charges. The record shows no such violation.

The Confrontation Clause of the Sixth Amendment to the United States Constitution "guarantees to the defendant the right to inquire about a witness's . . . pending criminal charges in an effort to show that the witness has 'possible biases, prejudices, or ulterior motives' that may influence his testimony." *Wright v. State*, 279 Ga. 498, 499 (614 SE2d 56) (2005) (citation omitted). However, the Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish," and "[l]imitations on cross-examination are generally reasonable so long as the court does not cut off all inquiry on a subject that the defense is entitled to cross-examine on." *Shaw v. State*, 301 Ga. 14, 19 (799 SE2d 186) (2017) (citations and punctuation omitted).

9

Appellant has not shown that the trial court placed any actual limitation on the questioning of Robinson about his pending charges. At the time of Appellant's trial, Robinson was detained in the Troup County Jail on charges of burglary and armed robbery from unrelated incidents. Before Robinson began testifying, the prosecutor asked the court to prohibit Appellant from asking about these charges, but the court declined to do so, saying that defense counsel could ask whether Robinson was getting a deal on the charges in exchange for testifying and might ask other questions that would be proper; the court told the prosecutor to object if he believed that a question was improper. When the prosecutor later objected to a question about the pending charges posed at the start of Robinson's cross-examination, the court had an off-the-record bench conference with the lawyers, but the court never ruled on the objection on the record.[7] Moreover, without objection, Appellant's

---

[7] Appellant does not identify any such ruling in the record, and neither party asserts that the court made a clear ruling on the State's objection during the off-the-record bench conference.

counsel then asked Robinson (and later also asked the lead detective and Edmundson) several questions related to the pending charges, and the prosecutor asked Robinson if he had a deal with the State regarding those charges; Robinson said he did not. Appellant's counsel also sought to impeach Robinson in other ways, including by questioning Robinson about his potential complicity in, but lack of charges related to, Williams's murder.

Given the trial court's ruling declining to prohibit Appellant from asking any questions about Robinson's pending charges, and the questions that defense counsel and the prosecutor then asked about those charges, Appellant has failed to demonstrate that the court imposed any actual limitation on his questioning, much less an unreasonable restriction. See, e.g., *Watkins v. State*, 276 Ga. 578, 582-583 (581 SE2d 23) (2003) (holding that the trial court did not impermissibly restrict cross-examination where the only limitation concerned the specific nature of the pending criminal charges and "the jury learned through . . . cross-examination that [the witness]

11

had charges currently pending against her, that she had been indicted by a grand jury, and the month and year when she had been indicted," as well as "whether her testimony at trial was related to the pending charges against her" (footnote omitted)); *Turtle v. State*, 271 Ga. 440, 444 (520 SE2d 211) (1999) (concluding that there was no error where the trial court actually permitted defense counsel to question the witness about the topics at issue). Compare *Hines v. State*, 249 Ga. 257, 260 (290 SE2d 911) (1982) (holding that the trial court abused its discretion by prohibiting all inquiry into the witness's pending charges).

3. Appellant also contends that the trial court erred by admitting into evidence a video recording of Bishop Bloods members beating Williams. Appellant argues that because he did not appear in the video, it was not relevant and was highly prejudicial. We disagree.

(a) The State introduced into evidence a video recording showing members of the Bishop Bloods gang beating Williams, who

has a red bandana tied around his wrist; red is a color associated with that gang. In the video, which is a total of 29 seconds long, Williams is seen in a wooded area, surrounded by four young men who repeatedly punch him; he makes some ineffectual attempts to fight back. The fighting stops twice: once when the group gets too close to some bushes, and once when Williams falls to the ground. The State's gang expert explained that the video depicted a "beat in," in which Williams was beaten to show his worthiness to be in the gang. Appellant is not in the video, but he was sent the video by a member of the gang through a group message on Facebook on April 18, 2016, and about 30 seconds later, Appellant responded, "Hi[s] a[ss] got pained."

When the State sought to admit the video recording into evidence during the gang expert's testimony, Appellant objected, arguing that the video was irrelevant because it was taken over three months before the murder and Appellant was not in the video. The State responded that the video was relevant to show the

13

existence of the Bishop Bloods gang and to show motive. The trial court overruled the objection, and the video was then admitted and played for the jury.

(b) Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," OCGA § 24-4-401, and "[a]ll relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules," OCGA § 24-4-402. We review the trial court's decision to admit evidence for abuse of discretion. See *Anglin v. State*, 302 Ga. 333, 335 (806 SE2d 573) (2017).

The video was relevant and probative to show the existence of the Bishop Bloods gang and, because Appellant was sent the video and responded to it on Facebook, Appellant's association with the gang. See OCGA § 16-15-3 (3) ("The existence [of a criminal street gang] may be established by evidence of . . . distinguishing

characteristics, including, but not limited to, common activities, customs, or behaviors."). Moreover, the video helped to establish Appellant's motive to murder Williams. There was evidence that the Bishop Bloods gang had a "blood in, blood out" practice. See footnote 5 above. The video indicated that Appellant knew that Williams had been "blood in" with this beating three months before the murder, and supported the State's theory that Appellant's killing of Williams served as the "blood out." Thus, the trial court did not abuse its discretion in concluding that the video was relevant. See *Anglin*, 302 Ga. at 336-337 (concluding that evidence regarding gang membership was relevant to and probative of the defendant's motive because it provided context for the charged crimes).

Appellant also argues that the video should have been excluded under OCGA § 24-4-403 ("Rule 403") because its probative value was substantially outweighed by its prejudicial effect. Appellant did not make this argument at trial, so we review this claim only for plain error. See OCGA § 24-1-103 (d). There was no error at all.

Under Rule 403, "'(r)elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice(.)'" *Anglin*, 302 Ga. at 337. But as we have repeatedly explained:

> Rule 403 is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility. Thus, in reviewing issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact.

Id. (citation and punctuation omitted). As just discussed, the video of Williams's gang "beat in" was highly probative to establish Appellant's motive for the murder and its relationship to gang activity. See id. And the video was not *unduly* prejudicial, particularly because Appellant himself was not in the video beating Williams. Accordingly, the trial court did not abuse its discretion in admitting the video. See, e.g., *Middlebrooks v. State*, 310 Ga. 748, 751 (854 SE2d 503) (2021); *Jackson v. State*, 306 Ga. 706, 710 (832 SE2d 809) (2019); *Worthen v. State*, 306 Ga. 600, 606-607 (832 SE2d 335) (2019).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 15, 2021.
Murder. Troup Superior Court. Before Judge Sakrison.
*Juwayn Haddad*, for appellant.
*John H. Cranford, Jr., District Attorney, John C. Winne, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.