314 Ga. 335
FINAL COPY

S22A0477.  ELLINGTON v. THE STATE.

WARREN, Justice.

Vincent Ellington was tried by a Fulton County jury and
convicted of malice murder and other crimes in connection with the
shooting death of Jeremy Kanard Fulton.[1]  Ellington raises two

---

[1] Fulton was killed on May 6, 2016.  On September 30, 2016, a Fulton
County grand jury indicted Ellington on ten counts: malice murder, three
counts of felony murder, aggravated assault with a firearm, aggravated assault
with a motor vehicle, cruelty to children in the third degree, possession of a
firearm during the commission of a felony under OCGA § 16-11-106, possession
of a firearm by a convicted felon under OCGA § 16-11-131, and possession of a
firearm by a convicted felon during the commission of a felony under OCGA
§ 16-11-133.  After a jury trial from December 11 to 18, 2017, the jury found
Ellington guilty on all counts except aggravated assault with a motor vehicle,
for which the trial court entered an order of nolle prosequi.  On December 18,
2017, Ellington was sentenced to life in prison without the possibility of parole
for malice murder, 12 months to be served concurrently for third-degree child
cruelty, 5 years to be served consecutively for possession of a firearm during
the commission of a felony, and 15 years to be served consecutively for
possession of a firearm by a convicted felon during the commission of a felony;
the aggravated assault with a firearm count and the possession of a firearm by
a convicted felon count were merged for sentencing purposes, and the felony
murder counts were vacated by operation of law.  As discussed in Division 4
below, the possession of a firearm during the commission of a felony count,
OCGA § 16-11-106, should have merged with the conviction for possession of a
firearm by a convicted felon during the commission of a felony, OCGA § 16-11-

claims of error on appeal: (1) the evidence presented at trial was insufficient to support his convictions; and (2) the trial court erred when it limited his cross-examination of one of the State's witnesses. As noted in footnote 1 and in Division 4, we have identified a merger error that requires us to vacate in part and remand for resentencing. Otherwise, as explained more below, we affirm Ellington's convictions.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. On the evening of May 6, 2016, a large group of people was hanging out at an Atlanta shopping center. The shopping center included a barbershop, a Family Dollar, a pool hall, and a café. Witnesses described the gathering as a party atmosphere with somewhere between 65 to 150 or more people in attendance, playing music, drinking, and selling

133, and the trial court erred in sentencing Ellington on the former. Ellington timely filed a motion for new trial on December 20, 2017, which he twice amended through new counsel. On September 27, 2021, following a hearing, the trial court denied Ellington's motion for new trial, as amended. Ellington timely filed a notice of appeal on October 13, 2021. The case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

clothes, among other things.

According to Ellington's girlfriend, Nicole Durden, Ellington borrowed her burgundy Chevrolet Impala that night and drove Durden's two-year-old son, Meshiah, to the shopping center. Other witnesses who were at the shopping center testified that Ellington was also accompanied by an acquaintance who was wearing a straw hat. Ellington and the man with the straw hat went inside the barbershop to sell clothes and other merchandise. Multiple witnesses testified that Ellington was wearing an orange shirt and had a baby with him.[2]

When Fulton tried to purchase clothes from the man in the straw hat, the two men started arguing over the price. One witness testified that she saw a "dude" wearing an "orange sweater" with a baby in the barbershop with another "guy selling clothes" in a straw hat. She saw the man in the straw hat arguing with Fulton, and

---

[2] Two of those witnesses identified Ellington during the police investigation in photographic lineups, and again at trial, as the man they saw wearing an orange shirt and selling clothes inside the barbershop while holding a baby.

during that argument, the man wearing orange left the barbershop carrying the baby. Another witness, John Hill, testified that a man was selling "merchandise" inside the barbershop with another man who was holding a toddler. The man with the toddler exited the barbershop, and the barbershop owner then asked the man selling merchandise to leave. A few seconds later, the man who had been holding the toddler returned inside the barbershop "to get his companion and leave." The two men then exited the barbershop.

Approximately 15 or 20 seconds later, Hill also left the barbershop and went near his car in the parking lot to urinate. Hill testified that "[s]hortly after" he went outside, he "heard a little commotion" and "quarrelling." Hill turned around and saw "two guys at the back end of a car," then he saw a raised arm and heard three gunshots. Hill testified that he did not see the gun and that he could not describe or identify the two men because it was dark outside. But he heard a "bumping sound" that he assumed was the car "rolling over" or "back[ing] into" the victim, later verified to be Fulton, because "he fell right directly behind the car." After Fulton

4

was shot, the shooter jumped into a car, which witnesses described as "maroon or burgundy" or "red," and drove away. Despite witnesses' attempts to help Fulton, he died at the hospital in the early morning hours of May 7; the medical examiner who performed the autopsy concluded that the cause of death was a gunshot wound to the chest.

Two other witnesses in the parking lot described the shooter. One of them testified that the person firing the gun was a man wearing an orange shirt, though he later expressed uncertainty about the shooter's shirt color. This witness did not see Fulton with a gun at any point, but heard multiple gunshots before he saw Fulton fall "facedown" to the ground. The other witness testified that she saw a man in an "orangey-colored" shirt shooting in the parking lot. When they were later shown photographic lineups, neither of these witnesses was able to identify Ellington as the shooter.

According to Durden, Ellington and his acquaintance arrived at her apartment between 11:00 p.m. and 12:00 a.m. that night to

5

drop off Meshiah. Durden testified that when Ellington entered her apartment, he looked "shocked" and told her that "some dudes followed him out to the car" and "a shooting started." Durden testified that Meshiah looked as if "something happened that scared him." After leaving Meshiah with Durden, Ellington and his acquaintance left Durden's apartment. The next day, Durden went outside and saw that her car was full of bullet holes that had not been there the night before. She also testified that some of those bullet holes were near where Meshiah would sit in his car seat in her car. Durden was "upset" and called Ellington, who just repeated that there was a shooting.

Ricky Glover, the "neighborhood mechanic" at Durden's apartment complex, testified that Ellington called him on May 7 to ask him to fix a flat tire on Durden's Impala; phone records corroborated that a call was made from Ellington's phone to Glover's that day. While Glover fixed the flat tire, he noticed bullet holes in the car. When Glover asked Ellington what happened, Ellington said that "a guy started shooting and the car got shot" in "the

6

apartment" parking lot. Glover volunteered to fix the bullet holes for an additional fee. Glover applied Bondo body filler that Ellington had bought earlier that day,[3] but did not finish sanding or painting the car, so he left the supplies inside the car to finish the job later.

As part of law enforcement's investigation of the case, Detective Jamael Logan obtained a copy of a video surveillance tape from an Atlanta Police camera located near the crime scene that partially captured the events in the shopping center parking lot the night Fulton was shot. That surveillance video, which was admitted into evidence and played for the jury at trial, appeared to show a man wearing an orange shirt in the parking lot around the time of the shooting and then a car that matched witnesses' descriptions of the shooter's vehicle backing out of the lot.

The afternoon following the shooting, after viewing the surveillance video and speaking with witnesses, Detective Logan issued a "lookout citywide" for a "maroon four-door Chevy Impala

---

[3] A receipt showing that Ellington had purchased Bondo body filler and "dark cherry" colored paint from AutoZone on the morning of May 7 was entered into evidence at trial.

7

possibly with damage of bullet holes." That night, while working an evening shift as a security guard at Durden's apartment complex, Sergeant David Remec received an anonymous call about a "suspicious vehicle in a back parking lot." Behind the apartment complex, Sergeant Remec found a "maroon-in-color" Chevy Impala that had "fresh Bondo" on the front right of the car, and he noticed that the front right tire was a "used tire that was just put on the vehicle." Upon locating the vehicle, Sergeant Remec contacted the Atlanta Police Department's homicide unit, Detective Logan obtained a search warrant, and Durden's car was towed. A crime scene technician processed the car for evidence and latent fingerprints, took photos, and collected as evidence (among other things) an AutoZone bag that contained Bondo and a can of primer.

Ellington was arrested in July 2016. In a recording of Ellington's call to Durden from jail, Ellington told Durden to "stay silent[4] and stay strong" and said, "don't let them folks come to you

---

[4] During Durden's direct examination at trial, she agreed that Ellington said "stay silent" during the call from jail. But when cross-examined, she said that she thought it sounded like Ellington said "stay solid."

with no bulls**t." Days later, Detective Logan searched Ellington's house. During that search, Detective Logan did not find a gun or any of the clothing that witnesses stated they saw the shooter wearing, such as an orange shirt. When Ellington was made aware of that fact, he commented on a recorded phone call from jail to Durden that law enforcement would "never find" those items because they were "looking in the wrong house." In the weeks following his arrest, Ellington called Durden multiple times. Recordings of those calls reveal that Ellington asked Durden questions such as, "Are you rolling with [me] or against [me]?" and "Are you going to leave [me] in [here]?"

At trial, Ellington moved for a directed verdict after the State finished presenting evidence, arguing that the State presented only circumstantial evidence and failed to present any witnesses who "put[ ] a gun in Mr. Ellington's hand" or "identified him as being the person who actually shot Mr. Fulton." The trial court denied Ellington's motion for a directed verdict, and the jury later convicted Ellington on all counts except aggravated assault with a motor

vehicle.

2. Ellington contends that the trial court erred in denying his motion for a directed verdict because the evidence was insufficient to sustain his convictions. To that end, Ellington asserts that the State's case was based entirely on circumstantial evidence and that the State presented no evidence from which the jury could find that he possessed the requisite intent needed to prove the charged crimes or that he even committed the act of shooting Fulton. For the reasons explained below, this enumeration of error fails.

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979)). "The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for

10

determining the sufficiency of the evidence to support a conviction." *Fitts v. State*, 312 Ga. 134, 141 (859 SE2d 79) (2021) (citation and punctuation omitted). Under this review, we leave to the trier of fact "the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts," *Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020), we do not reweigh the evidence, *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019), and "[a]s long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld," *Clark v. State*, 309 Ga. 473, 477 (847 SE2d 364) (2020) (citation and punctuation omitted).

Additionally, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused," OCGA § 24-14-6. "[I]t is principally for the jury to determine whether an alternative hypothesis is reasonable," *Clark*,

11

309 Ga. at 477-478 (citation and punctuation omitted), and "this Court will not disturb" such a finding by the jury "unless it is insufficient as a matter of law," *Harris v. State*, 313 Ga. 225, 229 (869 SE2d 461) (2022) (citation and punctuation omitted).

With respect to Ellington's malice murder conviction, the State was required to prove that he "unlawfully and with malice aforethought, either express or implied, cause[d] the death of another human being." OCGA § 16-5-1 (a); see also id. at (b) ("Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart."). In making that determination, we keep in mind that we have long recognized that "[a] conviction for malice murder does not require a showing that the murder was premeditated or based on a preconceived intent to kill, insofar as malice aforethought can be formed instantly." *Howard v. State*, 308 Ga. 574, 576 (842 SE2d 12) (2020) (citation and

12

punctuation omitted). Moreover, "the issue of whether a killing is intentional and malicious is for the jury to determine from all the facts and circumstances." Id. (citation and punctuation omitted).

With respect to Ellington's conviction for cruelty to children in the third degree, the State was required to prove, based on the theory it advanced in this case, that Ellington committed a "forcible felony" as the "primary aggressor, having knowledge that a child under the age of 18 [was] present and [saw] or hear[d] the act." OCGA § 16-5-70 (d) (2). Finally, Ellington's conviction for possession of a firearm by a convicted felon during the commission of a felony required the State to prove, among other elements, that he possessed a firearm. See OCGA § 16-11-133 (b).[5]

To the extent Ellington challenges the sufficiency of the evidence related to counts that were merged for sentencing purposes or vacated by operation of law—felony murder, aggravated assault

---

[5] Ellington's challenge to this conviction on appeal is based solely on the alleged lack of evidence that he possessed a firearm. At trial, he stipulated that he was a convicted felon, and he does not challenge that element on appeal.

13

with a firearm, and possession of a firearm by a convicted felon under OCGA § 16-11-131—such challenges are moot by virtue of those convictions being merged or vacated for purposes of sentencing. See *Eggleston v. State*, 309 Ga. 888, 890-891 (848 SE2d 853) (2020); *Mills v. State*, 287 Ga. 828, 830 (700 SE2d 544) (2010). Moreover, we do not address the sufficiency of the evidence as to the count of possession of a firearm during the commission of a felony under OCGA § 16-11-106 because, as explained in Division 4, that conviction also should have been merged for sentencing purposes.

With respect to the remaining counts, the evidence presented at trial was sufficient to convict Ellington as a matter of constitutional due process and as a matter of Georgia statutory law. Here, two witnesses testified that they saw Ellington at the scene of the crimes—the shopping center—around the time of the murder, and that he had a small child with him at the time, was wearing an orange shirt, and was selling merchandise with another man. Witnesses also saw Ellington's acquaintance arguing with Fulton, and then Ellington and his acquaintance leaving together shortly

14

before the shooting. There was also testimony that there was arguing in the parking lot before the shooting, that the shooter fired multiple shots at the unarmed victim, and that the shooter ran over the victim with a car after shooting him. In addition to the two witnesses who identified Ellington in photographic lineups and at trial as the man in the orange shirt, multiple other witnesses also identified the shooter as wearing an orange shirt and as driving a car that matched the description of the burgundy Chevrolet Impala belonging to Durden, who testified that Ellington drove himself and Meshiah in the burgundy Impala that night. These eyewitness accounts were also corroborated by surveillance video from the nearby Atlanta Police camera. Moreover, the State presented evidence of Ellington's behavior, statements, and actions after the crimes that included Durden's testimony that Ellington looked "shocked" and Meshiah looked "scared" when they arrived back at her apartment the night of Fulton's murder; Ellington's admissions that he was present during a shooting that night; Ellington's attempts to have the bullet holes and other damage to Durden's car

15

repaired the next day; and incriminating statements Ellington made during jailhouse phone calls after his arrest. From this evidence, a reasonable jury was authorized to conclude that Ellington possessed a firearm and was the person who shot and killed Fulton—i.e., that he committed the relevant acts; that he did so with malice aforethought—i.e., the requisite intent; and that he did so with knowledge that Meshiah was present and heard the act. See OCGA §§ 16-5-1 (a), (b); 16-15-70 (d) (2); 16-11-133 (b); *Young v. State*, 305 Ga. 92, 94 (823 SE2d 774) (2019); *Cochran v. State*, 305 Ga. 827, 830 (828 SE2d 338) (2019); *Williams v. State*, 300 Ga. 161, 163-164 (794 SE2d 127) (2016).

Moreover, to the extent Ellington relies on certain inconsistencies across the various witnesses' testimony about the night of the crimes, the resolution of any such conflicts or inconsistencies in the evidence is for the jury, and we will not reweigh that evidence on appeal. See *Smith*, 308 Ga. at 84; *Ivey*, 305 Ga. at 159. Although Ellington points to the absence of physical evidence such as fingerprints, DNA, or ballistics evidence

specifically linking him to the crimes, and contends there was no testimony that Ellington had a firearm or discharged a firearm at Fulton, we have recognized that "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence," *Plez v. State*, 300 Ga. 505, 506 (796 SE2d 704) (2017), such as DNA evidence or fingerprints, *Gittens v. State*, 307 Ga. 841, 842 (838 SE2d 888) (2020).

Finally, Ellington contends that the State did not exclude every other reasonable hypothesis except for his guilt. See OCGA § 24-14-6. At trial, Ellington contended during his closing argument that the State's theory of the case was "absurd," "ridiculous," and "not supported by the evidence whatsoever," and suggested that a more "logical explanation for what might have happened" was that someone else shot Fulton, and Ellington panicked and sped away with Meshiah to get them out of harm's way. Now on appeal, Ellington alludes to that theory without actually articulating it or any other alternative hypothesis that he says the jury was

17

authorized to consider. However, even assuming that the evidence of Ellington's guilt was wholly circumstantial, the jury was not required to find that Ellington's theory was reasonable, see *Clark*, 309 Ga. at 477 ("not every hypothesis is reasonable" (citation and punctuation omitted)); *Cochran*, 305 Ga. at 829 ("the evidence does not have to exclude every conceivable inference or hypothesis" (citation and punctuation omitted)), and instead could have reasonably inferred from the evidence presented at trial that the only reasonable hypothesis was that Ellington shot and killed Fulton in the presence of Meshiah. See *Poole v. State*, 312 Ga. 515, 522-523 (863 SE2d 93) (2021); *Howell v. State*, 307 Ga. 865, 872 (838 SE2d 839) (2020).

The evidence presented at trial and summarized in part above was sufficient as a matter of constitutional due process for a rational trier of fact to have found Ellington guilty beyond a reasonable doubt of the crimes for which he was convicted, see *Jackson*, 443 U.S. at 319, and for a rational trier of fact to find no reasonable hypothesis other than Ellington's guilt, see OCGA § 24-14-6. Ellington's

18

arguments therefore fail.

3. Ellington contends that the trial court erred when it prohibited him from cross-examining Durden more fully regarding unrelated criminal charges that were pending against her at the time she testified at his trial. Specifically, he contends that by restricting Durden's cross-examination, the trial court violated Ellington's right to confront witnesses who testify against him under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution.[6] For the reasons explained below, this enumeration of error fails.

During a sidebar conference at trial, the State raised concerns that Ellington planned to impeach Durden by cross-examining her about the facts of her then-pending aggravated assault case in

_____

[6] Despite citing the Georgia Constitution's Confrontation Clause, Ellington makes no argument that the Confrontation Clause contained in Article I, Section I, Paragraph XIV of the Georgia Constitution should be construed differently than the parallel provision contained in the Sixth Amendment to the United States Constitution. Therefore, we decline to consider in this case whether the relevant provision in the Georgia Constitution should be construed differently than the federal provision. See, e.g., *State v. Holland*, 308 Ga. 412, 413 n.3 (841 SE2d 723) (2020).

Fulton County. The State objected that such questioning would constitute improper character evidence, but agreed that the type of crime being charged and the fact that the case was pending could be properly admitted into evidence. Ellington's trial counsel explained that he wanted to ask Durden: "[do] you understand that you are charged with aggravated assault for pointing a handgun at the head of [another person]?" as stated in the indictment for those charges. He further noted he was "not trying to go past the face of the indictment" and was "not looking to go into the underlying facts behind the allegations."

The trial court ruled that Ellington was permitted to elicit on cross-examination what crimes Durden was charged with, when she was indicted, and whether the charges remained pending—but not the underlying facts or circumstances of the charged offenses, which were referenced in Durden's indictment. Further, the court did not permit questioning on the potential sentences for the charged crimes. Ellington's attorney did not object but responded: "Okay. Thank you, Judge."

Ellington's trial counsel asked Durden on cross-examination if she had a pending case in Fulton County for aggravated assault and reckless conduct, if she had been indicted for those charges, if her pending case was brought by the same District Attorney's office as Ellington's case, and if her pending case impacted her testimony in Ellington's case. Durden acknowledged the pending charges and denied that her pending case affected her testimony.

In denying Ellington's motion for new trial on this enumeration, the trial court found that he failed to object to the court's limitations on Durden's cross-examination; that the trial court did not abuse its discretion in imposing a reasonable limitation; and that Ellington was still able to explore Durden's pending charges and her alleged motives on cross-examination.

Because Ellington made no objection to the trial court's ruling regarding the scope and limits of his cross-examination of Durden, we review that ruling only for plain error. See OCGA § 24-1-103 (d); *Anthony v. State*, 303 Ga. 399, 407 (811 SE2d 399) (2018) (where trial court ruled that Anthony's co-defendant could not cross-

21

examine a witness about an alleged prior arrest and the co-defendant "appeared to accept this ruling, and Anthony raised no objection," appellate review of Anthony's claim that the trial court improperly limited his co-defendant's ability to cross-examine the witness was reviewed "only for plain error"). See also *McKinney v. State*, 307 Ga. 129, 133 (834 SE2d 741) (2019) (holding that review of defendant's argument on appeal based on the Confrontation Clause was restricted to plain-error review because the defendant did not object on that ground at trial). To establish plain error, Ellington "must point to an error that was not affirmatively waived,"[7] and that "error must have been clear and not open to

---

[7] The State argues on appeal that Ellington's response of "Okay. Thank you, Judge," after the trial court announced its ruling regarding the scope of his cross-examination of Durden constituted an affirmative waiver of any error. However, we need not decide whether Ellington's response constituted an affirmative waiver, because his claim fails in any event under plain-error review. Compare *Grullon v. State*, 313 Ga. 40, 46 (867 SE2d 95) (2021) (holding that defendant's response of "no," when asked by the trial court whether he had any objection to jury charge, was not an affirmative waiver) and *Cheddersingh v. State*, 290 Ga. 680, 684 (724 SE2d 366) (2012) (holding that defendant did not intentionally relinquish and thus did not affirmatively waive an alleged error on appeal where the trial court asked counsel, "Is the verdict form acceptable to the defense?" and counsel responded, "I believe so. Let me look at it one more time," but never objected) with *Lewis v. State*, 312

reasonable dispute, . . . must have affected his substantial rights, and . . . must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *McKinney*, 307 Ga. at 134 (citation and punctuation omitted).

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. Const. Amend. VI, and moreover, "[e]very person charged with an offense against the laws of this state . . . shall be confronted with the witnesses testifying against such person," Ga. Const. of 1983, Art. I, Sec. I, Par. XIV. We have recognized that "[t]he Confrontation

---

Ga. 537, 541 (863 SE2d 65) (2021) (holding that defendant intentionally relinquished and thus affirmatively waived alleged error in trial court's failure to give jury instruction on voluntary manslaughter where trial counsel withdrew the voluntary manslaughter charge she initially requested and then affirmatively opposed the instruction at the charge conference) and *Adams v. State*, 306 Ga. 1, 3 (829 SE2d 126) (2019) (holding that defendant affirmatively waived an alleged error on appeal regarding the admissibility of a certain exhibit into evidence where, when asked by the trial court for his thoughts in response to the State's argument that the exhibit was admissible, trial counsel said "Judge, we don't object. I think it is proper to come in") and *Zakas v. Jackson*, 352 Ga. App. 597, 599-600 (835 SE2d 371) (2019) (holding that counsel affirmatively waived plain-error review of whether witness's testimony was improperly limited where counsel told the court after its ruling that he was "okay with that" and "elect[ed] to rephrase his question" to a witness "to comply with the court's prior ruling").

Clause of the Sixth Amendment to the United States Constitution guarantees to the defendant the right to inquire about a witness's pending criminal charges in an effort to show that the witness has possible biases, prejudices, or ulterior motives that may influence [her] testimony." *Carston v. State*, 310 Ga. 797, 800 (854 SE2d 684) (2021) (citation and punctuation omitted).  But we have also said that the Sixth Amendment's Confrontation Clause "does not guarantee cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Id. (citation and punctuation omitted). As such, "limitations on cross-examination are generally reasonable so long as the court does not cut off all inquiry on a subject that the defense is entitled to cross-examine on." Id. (citation and punctuation omitted).  See also *Nicely v. State*, 291 Ga. 788, 796 (733 SE2d 715) (2012) ("[T]he right of cross-examination is not an absolute right that mandates unlimited questioning by the defense." (citation and punctuation omitted)).

Here, Ellington has not demonstrated that the trial court erred—let alone clearly erred—in imposing the limitations it placed

24

on Ellington's cross-examination of Durden. The record shows that the trial court allowed Ellington to cross-examine Durden about her pending criminal charges because of their potential effect on her motive or bias in testifying, while also recognizing that a defendant who seeks to impeach a witness by asking about the witness's prior crimes generally is not entitled to ask about the specific facts underlying those crimes. See *Smith v. State,* 300 Ga. 538, 542 (796 SE2d 666) (2017) (trial court's limitation on cross-examination about pending charges was appropriate where defendant was still "permitted to cross-examine [witness] concerning his potential motive or bias" related to those charges); *Watkins v. State*, 276 Ga. 578, 580-582 (581 SE2d 23) (2003) (trial court did not impermissibly restrict defendant's cross-examination of witness by ruling that defendant could question witness "about [pending] charges in order to address any bias the witness might have as a result of the pending charges," but "could not ask [witness] about the specific nature of the charges"); *Brown v. State*, 276 Ga. 192, 193-194 (576 SE2d 870) (2003) (recognizing that "the Confrontation Clause gives a

defendant the right to cross-examine a witness regarding [ ] pending charges so as to expose any bias or motive the witness may have for testifying for the State," but refusing to adopt a rule "that would permit a defendant to cross-examine a witness about the specific underlying facts of pending criminal charges"). The trial court's ruling also follows our precedent that "where a witness has not obtained a concrete plea deal from the State in exchange for [her] testimony, the accused may not bring out the potential penalties faced by the witness." *Smith*, 300 Ga. at 542 (citation and punctuation omitted). And to the extent that Ellington's appellate argument is based on his contention that *Smith* should be overruled, "plain error cannot be based on an extension of existing precedent, much less on the overruling of existing precedent." *Wilson v. State*, 312 Ga. 174, 181 (860 SE2d 485) (2021) (citing *Dunbar v. State*, 309 Ga. 252, 258 (845 SE2d 607) (2020)). Under the circumstances of this case, Ellington has failed to establish that the trial court plainly erred when it allowed Ellington to cross-examine Durden about what criminal charges she had pending against her and about her

potential motive or bias in relation to them, but prohibited Ellington from eliciting testimony about the specific facts underlying those charges or about the potential sentences they carried. See, e.g., *Smith*, 300 Ga. at 541-542; *Watkins*, 276 Ga. at 580-582; *Brown*, 276 Ga. at 193-194. Ellington's claim therefore fails.

4. Even though Ellington does not raise any merger issues on appeal, our review of the record shows that his conviction for possession of a firearm during the commission of a felony (Count 8) should have merged for sentencing purposes into the conviction for possession of a firearm by a convicted felon during the commission of a felony (Count 10). See *Marshall v. State*, 309 Ga. 698, 701 (848 SE2d 389) (2020); see also *Dixon v. State*, 302 Ga. 691, 697-698 (808 SE2d 696) (2017) (explaining that although this Court will only exercise its discretion to correct unraised merger errors that benefit criminal defendants in "exceptional circumstances," this Court's general practice is to exercise its discretion to sua sponte correct merger errors that harm a defendant). And because the trial court purported to impose a sentence on Count 8 that would run

27

consecutive to his malice murder sentence and would be followed by another consecutive sentence on Count 10, we vacate Ellington's conviction on Count 8 and remand the case to the trial court for resentencing. See *Edwards v. State*, 301 Ga. 822, 823 n.1, 829 (804 SE2d 404) (2017).

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.*

Decided August 9, 2022.

Murder. Fulton Superior Court. Before Judge Millender.

*Michael S. Webb, Kenneth W. Sheppard, Jonathan O. Oden*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Mathew E. Plott, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Parisa F. Sarfarazi, Assistant Attorney General*, for appellee.